## ROBERT BRADLEY *vs.* BENJAMIN POOLE.

A motion made, after a plaintiff has put in his evidence, for a ruling that, assuming that all the facts offered to be proved by him are actually and fully proved, he is not entitled to recover, is addressed to the discretion of the presiding judge; and the defendant cannot except to his refusal to make such ruling.

A mining company organized under the general corporation act (Gen. Sts. c. 61) bargained, through two of the directors, for a piece of mineral land in Colorado for the price of one hundred and twenty thousand dollars, and in payment gave checks which there were no funds to meet and the seller at once gave back agreeing to accept thirty thousand shares of the stock instead; and one of these directors paid him five thousand dollars in money and also paid off incumbrances on the land to the amount of sixty-five hundred dollars. Certain officers of the company, including this director, then deposited with the secretary of the Commonwealth the certificate required by the Gen. Sts. c. 61, § 8, stating therein on oath that the amount of the capital stock was five hundred thousand dollars, divided into shares of the par value of five dollars each, and that four hundred thousand dollars had been paid in. Twenty thousand shares were then reserved in the treasurer's hands to be sold to raise a working capital; and of the thirty thousand shares allotted to the seller of the land twenty thousand were issued to this director, to hold as security for the ten thousand five hundred dollars which he paid, with authority to sell enough of them to reimburse himself; and the rest of the hundred thousand shares were issued and distributed without any payment therefor, this director receiving several thousand shares in compensation for his services in the negotiation for the land; and he was appointed "a committee to regulate the sale of the stock," with an understanding with the company that it should not be put on the market until he should have been reimbursed. But no money was ever paid into the treasury of the company, and its only property was the land. Shortly afterwards, on complaint by the treasurer of the Commonwealth for nonpayment of a tax of three hundred dollars, the company was enjoined by this court against further prosecuting business, and the injunction was never removed. Between two and three months after this, in reply to inquiries of a person about the company, this director said that he could "let him have some" of the stock, or "buy him some," and advised him to make such a purchase, remarking that it was one of the best properties in Colorado and very valuable, and adding, "They are going right to work on it. It is all right," and not saying anything about the capital not having been paid in, nor mentioning the injunction; and said that "he" "would probably get it at a dollar and a half per share;" whereupon this person paid to him three thousand dollars for a certificate of two thousand shares transferred from a lot of stock which stood in the director's name as "agent." Subsequently, on discovering the existence of the injunction, the purchaser tendered back the stock without delay, and demanded repayment of his money, which was refused. In an action brought by him against the director to recover the money as having been obtained by false and fraudulent representations, *Held,* that the jury were warranted in finding that the defendant's representations to the plaintiff were material, and were false and fraudulent ; and that the defendant acted as principal, and not as agent for others, in the sale; *Held also,* that the fact that some months before his purchase the plaintiff was informed by the treasurer that eighty thousand shares at a dollar and a half per share would pay for the property put into the company, and that at the time of purchasing he "did not suppose that the property actually cost the company five hundred thousand dollars or was put in at the par value

of the shares," was not sufficient to justify the setting aside of the verdict on the ground that he had such knowledge of the condition of the company that he could not have been deceived by the defendant's representations.

CONTRACT for money received to the plaintiff's use, alleged to have been paid to the defendant, in consequence of false and fraudulent representations made by him, for certain pretended shares in a corporation fraudulently organized, which shares the plaintiff afterwards tendered back; said false and fraudulent representations being "that said corporation was all right and would immediately prosecute the development of its property in Colorado and the business for which it was organized, and that said shares were of great value."

At the trial in the superior court, before *Ames*, J., the plaintiff, who lived in Portland, testified that he had previous stock transactions with the defendant, and one day, in November 1864, at the defendant's office in Boston, " made some inquiries of him about the Stewart Gold Mining Company, saying at the same time that he would like to invest some money;" and the defendant answered : " Would you like to buy some stock in that company? I think I can let you have some," or "can buy you some." "It is one of the best properties in Colorado. It is very valuable. They are going right to work on it. It is all right. You had better buy some of the stock, and get your friends to do so;" and that the defendant said that the price of shares was one dollar and fifty cents each, and that "he" "would probably get it" at that rate, but did not say anything about the capital not having been paid in, nor about the organization of the company, nor about any injunction prohibiting it from doing business. And the plaintiff testified that he answered that he would take two thousand shares; and that soon afterwards he received the certificate thereof from the defendant, and paid him three thousand dollars; that, although he " heard that there was some trouble," yet it was not until in December, 1865, that he " knew anything definite about the company," when he heard that there was an injunction against its prosecuting business, and, on examining the records at the office of the clerk of this court, found that such was the fact; and that on the same

day he tendered back to the defendant an assignment of the shares, duly executed, and demanded repayment of his money, saying: " When I bought, you said it was all right. You said nothing of the injunction. I consider you had no right to issue any stock. You represented it as very valuable, and all right, and that they were going to work on it immediately ; " but that the defendant refused to pay back the money. It appeared also by the plaintiff's testimony that " some months before " November, 1864, he had some conversation with the defendant about this company, the details of which did not appear.

The plaintiff introduced in evidence record copies of a complaint to this court by the treasurer of the Commonwealth against the Stewart Gold Mining Company for nonpayment of a tax of three hundred dollars, and the decree thereon ordering an injunction to issue restraining the company from prosecution of business, and the writ of injunction, dated September 3, 1864, and the officer's return thereon showing that it was served three days afterwards on Charles Durham, the treasurer of the company ; and it appeared that this injunction had never been removed.

The plaintiff also called Durham as a witness, who testified that the projectors of the company were himself and the defendant, with Gustavus F. Sargent and some others, who together, on February 12, 1864, signed articles of association under the general corporation act, and organized the company on that day ; and the certificate deposited by officers of the company, under the act, with the secretary of the Commonwealth, dated March 15, 1864, and filed the next day, was also put in evidence by the plaintiff, signed and sworn to by John Merrill as president, Durham as treasurer, and Merrill and Sargent with the defendant as a majority of the directors, certifying that " the amount of capital stock is five hundred thousand dollars, the par value of the shares is five dollars per share, the amount paid in is four hundred thousand dollars, the place of business is Boston," and " its purposes are to acquire mineral lands and mining rights in Colorado Territory, to mine on said lands and rights for gold and other ores, and to sell said

ores, or to reduce the same to metals and sell the metals, as may be most for the advantage of the corporation." But the plaintiff, by his counsel, stated " that he did not rely on the fact that the company delayed going on with mining operations, independent of concealments by the defendant."

And Durham testified further as follows: " We had arranged to buy the property of a Mr. Coffin from Colorado, at a hundred and twenty thousand dollars. The capital of the company was fixed at five hundred thousand dollars, of which one hundred thousand was to be working capital; that is, twenty thousand shares, at five dollars, were to remain in the treasurer's hands. Checks to the amount of a hundred and twenty thousand dollars were left with me to pay Coffin for the property, which was put into the company at five hundred thousand dollars, the owner of the mine accepting thirty thousand shares instead of the hundred and twenty thousand dollars agreed on, and the checks were destroyed. The shares left with the treasurer were to be sold to raise a working capital. A lien on the property of about sixty-five hundred dollars was paid off, and about five thousand dollars paid to Coffin in cash. This money Poole furnished. I don't know where or how he obtained it. The land was considered as five hundred thousand dollars. The individual subscribers paid nothing on their shares. I had three thousand shares personally, and held the twenty thousand as treasurer in trust. Poole had three thousand in his own right, six thousand as agent, and twenty thousand as agent or trustee. He paid nothing into the treasury of the company. Coffin received shares as his profit. So far as I know, Poole has not been repaid the money he advanced. He has been one of the directors the whole time. On November 29, 1864, I transferred to the plaintiff two thousand shares from Poole's account as agent, signing ' Benjamin Poole, by Charles Durham, attorney.' Poole had previously given up his certificates to the company, and, on disposing of any of the shares, a new certificate was to issue. When he proposed to assign to the plaintiff, I inquired about the injunction, but he said that it did not amount to anything, that he would see the attorney general and get it fixed.'

On cross-examination the witness said that the transfer to the plaintiff was in Poole's name as agent, and that he believed that Poole did not return the certificate standing in his name previously; and further testified that he then and ever since believed the property to be of great value.

At this stage of the case, the plaintiff having rested, the defendant asked the judge to rule that the plaintiff was not entitled to recover, assuming all the facts offered in evidence by him to be fully proved; but the judge declined so to rule.

The cross-examination of Durham was therefore resumed, when he testified that in March or April 1864 he had a conversation with the plaintiff at Portland, in the course of which the plaintiff introduced the subject of this mining company and made inquiries concerning it, and in which the witness showed a prospectus and said that he thought it was valuable, that there was money in it, that the stock was divided into a hundred thousand shares at five dollars per share, and twenty thousand shares were reserved for working capital, and eighty thousand shares at a dollar and a half per share would pay for the property put into the company; and the witness testified that he offered at that time to sell his own stock to the plaintiff. And it appeared further, by the testimony of this witness, that thirteen certificates of stock in the company were issued together on March 18, 1864, and Poole was appointed " a committee to regulate the sale of the stock " and " none was to be issued till July except by his authority; " that " the company did not want the stock to be put in the market until the incumbrances were paid off, and Poole was to retain the stock to meet the incumbrances, and to let Coffin dispose of or distribute the balance of the twenty thousand shares in his hands as agent or trustee that should come to him after enough of his proportion had been sold to pay off the incumbrances; " and the witness repeated that " so far as he knew, none of the stockholders paid anything to the company for their shares."

The defendant testified and offered much other testimony, including that of Sargent, tending to show " that after the project was suggested to him by Coffin he expended much time

and labor in getting authentic information about the value of the property, seeing, for that purpose, many persons from Colorado familiar with such property and acquainted with this, all of them men of character and entitled to confidence; that he then and ever since believed that it was and is of very great value; that Coffin had expended his means, and offered it at the price of a hundred and twenty thousand dollars, but preferred to be paid in stock if a company could be got up to operate it; that the defendant took three thousand shares in payment for his own services and expenses in making the arrangements; that he paid off the incumbrances from the proceeds of twenty thousand shares left in his hands, as agent, to be sold for Coffin, acting under Coffin's orders in so doing; that, being applied to by the plaintiff, who wanted to buy in, he told him expressly that he did not intend to sell any of his own stock, and also that the capital stock was half a million, but he thought he could get some at a dollar and a half per share; that the plaintiff said that he would like some as a 'flyer;' and that, after some time, the defendant succeeded in getting two thousand shares transferred to the plaintiff, half by Sargent and half by one Pierce, and the money paid by the plaintiff was immediately paid over to them; that no part of the stock so sold belonged to the defendant, and none of the money received was his, but that he acted merely as agent, not receiving one cent as commission or in any other way; and that, in a conversation in the spring of 1864, he expressly told the plaintiff the amount of the capital stock of the company and that the whole was paid for in property, and also told him the original price of the property as offered by Mr. Coffin."

The defendant further testified " that the delay in obtaining a working capital was for the purpose of ascertaining the best machinery and mode of working; that he fully believed that all the proceedings of the company had been legal and regular · that the injunction was only for the tax, and the company had intended to test the question as to its constitutionality; that officers were chosen before the purchase from Coffin was made, that the defendant and Sargent were a committee to buy; that

the stock set apart for Coffin was distributed as he directed, after the sale of a portion to raise money for the incumbrances; that efforts had been made to sell stock to raise a working capital, but without success; that of the shares sold to the plaintiff one thousand stood in name of the defendant, as agent, but really belonged to one Pierce; and that in March the incumbrances had been paid, and there was no reason for restraining the sale of the shares."

The defendant also contended, and offered evidence tending to show, that the representations to the plaintiff were not such as the plaintiff testified, but were mere general expressions of confidence and favorable expectations; and evidence was introduced tending to show that the mine was and is very rich in gold, but difficult of successful operation on account of the gold being in combination with sulphurets of other metals; and the plaintiff, being recalled, admitted "that he did not suppose that the property actually cost the company five hundred thousand dollars, or was put into the company at the par value of the shares, but did suppose that it actually cost a large sum of money."

The defendant then renewed his request for a ruling that there was no sufficient evidence of false and fraudulent representations on his part; which the judge again refused.

In his closing argument to the jury the defendant contended "that he did not personally sell the stock, nor receive the money paid therefor, but was acting only as agent of third persons, and so was not responsible to the plaintiff for money had and received; that he made no fraudulent or false representation, but, if he had, would not be liable in this action, because he was not the seller; that any representation that the property was valuable and all right, and that they expected to develop it, was too indefinite in its nature to mislead the plaintiff; and also that the plaintiff was not misled but fully understood the general state of the facts and bought upon his own judgment."

The plaintiff, in closing, contended on the contrary "that the stock, being issued for less than its par value, was fraudulent and void, and no title or value was conveyed to the plaintiff by the sale; that the defendant was bound to disclose the existence of

the injunction, and the manner in which the company had or
ganized and the stock had been issued ; and also that the alleged
organization was a fraud, and the shares were intended to be
distributed among buyers at a fictitious price greatly beyond the
cost and value of the entire property."

During the closing argument for the plaintiff the attention of
the court was called to the fact that the records of the company
(which had been introduced in evidence) did not indicate that
the articles of association under which it was claimed to have
been organized, were signed by any person ; and the treasurer,
on search, failed to find any original agreement signed by any
of the persons described in his testimony as the projectors. The
plaintiff contended that in this condition of the record the com-
pany was not organized and the alleged shares had no legal
existence ; but the judge ruled *pro formâ* that evidence that the
company had acted as if organized would be *primâ facie* evi-
dence that it had been organized; and that the non-production
of the original agreement duly signed, and the failure to record
the same with the signatures, were not conclusive proof of a
fatal defect in the organization.

The judge instructed the jury " that although it appeared in
evidence that the organization of the company was irregular,
and perhaps improper, it did not necessarily follow that it was
fraudulent ; that if three or more persons, owning real estate on
which they intended to carry on mining operations, should, for
the sake of convenience, organize themselves as a corporation,
putting in their joint property at what they honestly, under
the influence of sanguine or even somewhat extravagant im-
pressions as to the prospects of the intended business, believe to
be the value of the property, it would not be fraud, even though
they should prove to be greatly mistaken in their estimate ; but
would be wholly a question of good faith and honest intent,
and that they might be substantially in the same position as if
they had paid in the amount of their shares in cash, and the
company had distributed the same cash among the owners of
the real estate, as payment therefor; that the rule *caveat emptor*
applies to the purchase of stock, as well as of other property

and the purchaser has to consider how much and what property the corporation owns, what proportion of the whole is represented by a single share, and whether the corporation owes any debts, and to what amount, and, if he is not misinformed on either of these points, has no right to complain if he should be disappointed in the result."

And he further instructed them "that if no money at all, or only a small amount to take off incumbrances, was actually paid in, if the seller and the buyers became joint owners as co-corporators, the questions for them would be : Was it a scheme to deceive or mislead anybody ? Was it a device to sell the property by causing unsuspecting persons to buy in, in such a manner that such buyers were to pay the full value or more, leaving the projectors to hold their shares free of cost or at a low price ? Was it put in at a nominal and excessive price, with the intent by deeds or words to convey to buyers the idea that the original projectors had really invested the nominal amount, or a very large amount, in the purchase and preparation for business? Was it a mere 'bogus' corporation, not having any real capital, or only a small and nominal one, got up to run off the property at an excessive price, by intentionally impressing buyers with the idea that the projectors had themselves invested according to the nominal price ? and that, if the answer to these questions should be in the affirmative, any person buying stock of one of the projectors under such influences might have a right to recover back the money paid to him on such purchase."

The judge instructed the jury also, "that they were next to consider the question whether the defendant sold the property in question personally, or was merely employed to procure it for the plaintiff; that if he acted merely as the agent for some third person, to whom he was accountable for the money that should be obtained, he would not be responsible in this action; but if, on being applied to, he disclosed no agency for anybody else, but undertook as between himself and the plaintiff to procure and supply himself with two thousand shares to sell to him, and did so, that would be a sale by the defendant to the plaintiff

that the plaintiff claimed that at least a thousand of the shares stood in the name of Poole, and although the word ' agent' was written after his name yet he really had full control of them and was not in fact agent for anybody, and that he and Sargent were one in interest and feeling, merely sharing the proceeds of the sale; but that the testimony of the defendant and Sargent wholly denied this claim."

And he instructed them further " that, if the company was honestly organized, and Poole sold the stock to the plaintiff, the latter, in order to recover, must show that Poole made representations about the property which were material, which were of a nature to influence, and did in fact influence, his judgment in deciding to make the purchase; that those representations were untrue, and that Poole knew them to be untrue; that the representations that the company was all right, had a very valuable property, and was about to go to work in developing it, would be immaterial, if they were merely expressive generally of san· guine expectations and commendation of the enterprise as likely in his belief to be profitable ; but if, however, they were spoken on such an occasion, and in such a connection, and with such attending circumstances, as reasonably to give the plaintiff to understand them to mean that the company was well organized, had ample means and paid-up cash capital, they would be material; that, if the plaintiff knew the true state of the facts already, and that the land was put in at a nominal price, and, above all, if he knew that the land constituted all the actual capital of the company, and the working capital was yet to be obtained by selling the reserved stock at the best price they could get, the plaintiff was not in a condition to say that the alleged misrepresentations affected or influenced his judgment · that the plaintiff must also prove that the representations were not true in the sense in which they were material, and also that defendant knew they were not true."

The jury returned a verdict for the plaintiff; and the defend· ant alleged exceptions.

*C. B. Goodrich & T. H. Sweetser*, for the defendant.

*T. M. Hayes*, for the plaintifI.

CHAPMAN, J. After the plaintiff's testimony was put in, the defendant's counsel requested the court to rule that, assuming that all the facts offered to be proved by the plaintiff were actually and fully proved, the plaintiff was not entitled to recover, and the case should be withdrawn from the jury and a verdict directed for the defendant. This motion was denied, and the defendant excepts to the decision. But it is settled that it is a matter of discretion with the presiding judge whether he will grant or deny such a motion. *Bassett* v. *Porter*, 4 Cush. 487. *Mc Gregory* v. *Prescott*, 5 Cush. 67. *Wentworth* v. *Leonard*, 4 Cush. 418. No exception therefore lies to his decision. The defendant then proceeded to offer evidence in the case; and, by the authority of the cases cited, this was a waiver of his motion.

After all the evidence was in, the defendant renewed his motion that the jury be instructed that there was no evidence of false and fraudulent representations on the part of the defendant. The judge declined to make such a ruling, and the evidence was submitted to the jury. The ruling is to be sustained if there was any evidence sufficient in law to authorize the jury to find that there were materially false and fraudulent representations on the part of the defendant. But several points were argued before the jury, and the instructions given to them by the presiding judge not only included the point above stated, but embraced the general principles of law which are applicable to cases of this character. These instructions are excepted to.

The attention of the jury was directed not only to the representations made to the plaintiff at the time he purchased the stock, and the condition of the corporation at that time, but to the original character and object of the scheme.

The representations proved and relied upon were: " They are going right to work upon it. It is all right." It was properly left to the jury to interpret these statements. In connection with the circumstances of the case and the rest of the conversation between the parties, they would be authorized to interpret them as representations that the company had pecuniary means to engage in the business of mining upon their lands in

Colorado, and had made arrangements to do so immediately and that no legal obstacle existed to the prosecution of their business or the transfer of stock upon their books.

The evidence tended to show that the actual condition of things was very different from this. The company was organized in February 1864, and the defendant was one of the projectors. The capital stock was fixed at five hundred thousand dollars, and the par value of the shares at five dollars, so that there would be a hundred thousand shares. It would be legally competent to the jury to find that this small value of the shares was intended rather as a lure to certain classes of purchasers of shares who might be easily imposed upon, than as indicating an intention to prosecute the business of mining. No money was paid by any of the associates to constitute this stock. All the property which the corporation had was certain mining lands in Colorado which were conveyed to them by Coffin. They paid him no money for them. They fixed the price at a hundred and twenty thousand dollars and gave checks for that amount. But they had no money on deposit to pay these checks; and the jury might believe that it was a fictitious arrangement, for the checks were immediately given up, and Coffin accepted in their stead thirty thousand shares of the stock. His land being the only capital possessed by the company, these shares were equivalent to three tenths of it; subject however to a debt of ten thousand five hundred dollars due to the defendant for money which he had advanced. If they valued the shares at the price for which the defendant sold to the plaintiff, Coffin's shares would be worth forty-five thousand dollars. If they were valued at par, they would be worth a hundred and fifty thousand dollars, so that the price of one hundred and twenty thousand dollars was merely nominal. The value of the land was then called four hundred thousand dollars, and twenty thousand shares were reserved to be sold in order to obtain the other one hundred thousand dollars. The jury might believe that they never expected to raise such a sum in such a way; and that a hundred and twenty thousand dollars was, to the knowledge of all of them, a grossly exaggerated estimate of the value of the land, and that the

projectors understood that the principal value of their stock consisted in the ingenious scheme which they had adopted for putting the shares in the market.

While they were in possession of no property except the land, and owed the defendant ten thousand five hundred dollars, the president, treasurer, and three directors, of whom the defendant was one, made a certificate under oath, and filed it with the treasurer of the Commonwealth on the 16th of March, 1864, in compliance with the requirements of Gen. Sts. *c.* 61, § 8, in which they made the following statement: " The amount of capital stock is five hundred thousand dollars; the par value of the shares is five dollars per share; the amount paid in is four hundred thousand dollars." The jury might believe that this statement as to the amount paid in was false and fraudulent, and was designed to defraud the public.

On the 6th day of September 1864, an injunction was served upon the company, restraining them from doing any more business because they had not paid a tax of three hundred dollars which had been assessed upon them by the Commonwealth; and this injunction has never been removed. The jury would be authorized to take this fact into consideration in estimating the value of their property, and deciding whether their scheme was *bonâ fide* or fraudulent. After this, the plaintiff purchased his stock, and it was transferred to him on November 29, 1864.

The jury might upon this evidence believe that the company was not all right, but that it could not legally proceed to do any business; that it was not going right to work, and had neither the means nor the intention to do so; that the original scheme was fraudulent, and, the property was estimated at a grossly fictitious value, and that the defendant and his associates had been guilty of false swearing in their official certificate for the purpose of promoting their scheme. All these matters were properly submitted to the jury with instructions sufficiently full and appropriate. It may be well to refer to some of the cases in which some of the principles stated by the learned judge have been discussed.

In *Campbell* v. *Fleming*, 1 Ad & El. 40, it was held that one

who was induced to purchase stock in a mining company by fraudulent representations as to its value might repudiate the transaction if he would do so as soon as he was informed of the fraud.

In *Duvergier* v. *Fellows*, 5 Bing. 248, it was held that a contract made between two persons who were engaged in getting up an illegal and fraudulent enterprise, and made for the purpose of carrying on such enterprise, could not be enforced at law. Chief Justice Best says of the case: " It is manifest that the scheme in which the parties to this action were engaged was one of those bubbles by which, to the disgrace of the present age, a few projectors have obtained the money of a great number of ignorant and credulous persons, to the ruin of those dupes and their families, and by which a passion for gambling has been excited that has been most injurious to commerce and to the morals of the people." He further says that such schemes are fraud-traps and injurious to the public welfare, and that the forming of them is indictable at common law.

These remarks are applicable to many transactions that have occurred in this country, and, if the jury found them applicable to this case, there would be no ground to say that there was no legal evidence to sustain such finding. The weight of the evidence is not now before the court.

The case of *Bagshaw* v. *Seymour*, 4 C. B. (N. S.) 873, was an action against the chairman of the directors of an Australian gold mining company. By a false representation as to the amount of money which they had paid in, they procured the committee of the stock exchange to place the stock on their list, and thus give it character and credit. The plaintiff was thereby induced to buy some shares of one Barclay on the stock exchange. It was held by the common bench that the defendant was liable to the plaintiff on the ground of this fraudulent representation made to the directors of the stock exchange. The case was carried by the defendant to the house of lords and there abandoned. The doctrine established in the case was that all the associates who had united in the fraudulent representation to the public were equally liable to a purchaser whom they had thus deceived and injured.

In *Bedford* v. *Bagshaw*, 4 H. & N. 538, the court of excheq-uer held the same doctrine in application to another Aus-tralian gold mining company. Pollock, B., remarked: "If a director of a company, one of the persons who puts the shares forth into the world, deliberately adopts a scheme of falsehood and fraud, the effect of which is that parties buy the shares in consequence of the falsehood, I should feel no difficulty in say-ing that in such case an action is maintainable."

In *Clarke* v. *Dickson*, 6 C. B. (N. S.) 453, where there was a sale of shares in a lead and copper mining company, the directors in their prospectus made a representation that the property had been purchased at a certain large price, when in truth it had been purchased by one of the directors at a very insignificant price. It was held that a purchaser could recover of one of the directors, although the false representations were not the sole in-ducement to him to purchase.

In *Watson* v. *Earl Charlemont*, 12 Q. B. 856, all the judges concurred in holding that if an untrue representation appears to be the act of the body of directors, and it is fraudulently made, the members are all answerable for the fraud; also that if an untrue statement is published which is likely to induce a party to enter into a contract, and he does so, the person who made the false statement is bound, independently of any proof that the other party was actually induced by it to contract; and that *primâ facie* it will be taken that he was influenced by it.

In *Jarrett* v. *Kennedy*, 6 C. B. 319, there had been a fraudu-lent suppression of facts by a majority of a railway committee. It was held that the plaintiff, who had subscribed for some shares and paid the deposit to the company, might recover it back from one of the committee in an action for money had and received.

In the light of these cases it is apparent that the representa-tions alleged to be false were material; and that there was evidence sufficient in law to authorize the jury to find that they were false and fraudulent in material particulars; so that the court cannot set aside the verdict on the ground that, in these respects, there is no evidence sufficient in law to sup-port it.

But it is contended that the defendant contracted with the plaintiff as the agent of other persons, and that there is no evidence which is sufficient in law to authorize a verdict against him on the ground that he was the principal.

On this point the plaintiff testified that when he proposed to buy some stock the defendant answered, " I think I can let you have some," or " can buy you some," and in speaking of the price said he would probably get it at a dollar and a half per share. He also said, " It is one of the best properties in Colorado. It is very valuable. They are going right to work upon it. It is all right. You had better buy some of the stock and get your friends to do so." The jury would be authorized to consider these expressions as evidence tending to show a personal interest in the sale rather than disinterested friendship. They might also consider the fact that the defendant was interested to get back the sum of ten thousand five hundred dollars which he had advanced, rather than make sales of stock for the benefit of his associates. It appeared also, in the plaintiff's evidence, that the transfer of the certificate to him was signed by Durham as the defendant's attorney, and that the money was paid by him to the defendant, who did not profess to receive it as agent, Durham corroborating him by stating that he made the transfer by the defendant's direction and as his attorney.

This testimony is sufficient in law to authorize the finding that the defendant acted as principal in the sale. None of it tends to show that he made the sale as the agent of Sargent and Pierce. The plaintiff testifies that he did so, and paid the money to them. But there is nothing to corroborate this statement, and its credibility was for the jury to decide upon.

It is also contended that the plaintiff had knowledge of the condition of the company to such an extent that he was not deceived. So far as this depends on the statements of Poole, the defendant, the jury might not be satisfied with them. The plaintiff admits that he did not suppose the property cost the company five hundred thousand dollars. But they did not represent that it cost over four hundred thousand dollars. He also says he did not suppose that it was put in at the par value

of the shares. It was never represented that it was put in at that price. Poole also told him that the stock would be a dollar and a half per share. But that is a mere statement of the price at which Poole was ready to sell it, or at which he could probably get it. All this is far from including the material facts in the case.

It is not necessary to refer to all the details of the instructions given to the jury. It is sufficient to say that they were in conformity with the decisions above referred to, and with the established principles of law as recognized both in England and this country.                    *Exceptions overruled.*