No. 60.—CÆSAR A. SAVAGE, plaintiff in error, *vs.* JOHN JACKSON, defendant in error.

[1.] A, in conversing with B about renting from him a certain store-house for C, says of C that he is a fine man and the owner of nine or ten negroes —able to do well. B, actuated partly by this statement, and partly by the general deportment and business of C, sells to C, from time to time, during a period of six or eight months, a quantity of merchandise on a credit. This, C fails to pay for: *Held*, that the statement aforesaid made by A, did not render him liable to pay for the merchandise.

Motion for new trial, in Baker Superior Court. Decided by Judge PERKINS, November Term, 1854.

This was an action for deceit, brought by John Jackson *vs.* Cæsar A. Savage, in false representations as to the solvency of one P. B. Bond. The testimony, as to the representation, was as follows:

WM. W. MANNA testified: That he was clerk of John

Jackson, and had a conversation with defendant (Savage) sometime in the month of February, 1847, relative to renting a certain store-house in Albany, known as the " Red House," belonging to Jackson, to Mr. P. B. Bond, who the defendant represented to be his brother-in-law—to be a fine man and the owner of 9 or 10 negroes—able to do well. In consequence of this conversation, witness, as clerk, extended credit to Mr. Bond in the store, to the amount of about $250. Bond paid about $80 on the account, and gave his note for the balance. Savage was proposing to rent the store-house for a carriage shop for Bond. Witness did not ask Savage about Bond, as the conversation led him to believe that Bond was quite solvent and a gentleman. Bond was engaged in business in Albany, and appeared to do well. The credit was extended to him—1st. Because of Savage's representations; and 2d, because of Bond's general deportment and business.

ISAAC BOND testified: That P. B. Bond's pecuniary circumstances, when he moved to Albany, were bad, and that fact was known to Savage. His character was good as any one's; he generally got credit when he asked for it, and complied with his contracts, to the best of his ability.

The Jury found a verdict for plaintiff. A new trial was moved for on several grounds; among others, that the verdict was contrary to law and evidence. The Court below refused a new trial, and this decision is assigned as error.

R. F. LYON, for plaintiff.

MORGAN, for defendant.

*By the Court.*—BENNING, J. delivering the opinion.

[1.] The verdict in this case, as it seems to us, was contrary to law. If there is any decision to give it support, it must be the decision in *Pasley vs. Freeman*, (3 *T. R.* 51; 2 *Smith's Lead. Cases*, 55.) But the decision in that case is

Savage *vs.* Jackson.

not one to give it support, for that case differed from this, in essential particulars.

1. In that case, the representation made was, that the purchaser of the goods was a person "safely to be trusted and given credit to," in "respect" to the very goods, in respect to which he was trusted—sixteen bags of cochineal. In this, the representation made had express reference to the renting of a house to or for the person who was afterwards trusted for the goods. The representation had no reference to the selling of the goods to him; certainly none to the selling of goods to him in the fashion in which the goods were sold to him. The goods were sold to him in parcels, and the sales ran through a period of more than eight months. Surely it cannot be maintained that a representation, to the effect that a man is safely to be trusted for the rent of a named storehouse, means to affirm, that the man is safely to be trusted for the price of an indefinite quantity of merchandise, to be furnished to him in parcels from time to time, as his occasions may require, through an indefinite period of time.

2. In *Pasley vs. Freeman*, the credit was founded on faith in the representation. In this, the credit was only in part founded on faith in the representation. In part, the credit was founded on faith in the "general deportment and business" of the person himself, about whom the representation was made. How, then, it is possible, in this case, to tell what part of the credit it was that was founded on the representation, and what part it was that was founded on the "general deportment and business" of the person himself, in whose favor the representation was made. And certainly the person making the representation ought not to be held responsible for that part of the credit, which was not founded on faith in his representation.

3. The representation in this case is far weaker—far less certain, than was that in *Pasley vs. Freeman*. The man " is able to do well." We frequently say that a man is *able* to do well, when we mean to intimate a belief, or at least a fear, that he will not do well.

In these important particulars, therefore, does the case in which this verdict was found, differ from *Pasley vs. Freeman*. This verdict, therefore, can derive no support from the decision in that case.

But is the decision in *Pasley vs. Freeman* to be regarded as right? I think not.

It is certain that that decision does not have for this Court the force of a precedent. It was made in 1789; and that was long after the time when the law of England was adopted by Georgia—long after the time when Georgia was colonized.

That decision, too, from its very date, met with strong opposition in England. At the time when it was made, Mr. Justice *Grose* ably and strenuously dissented from it. Lord *Elden* could never abide it. It is one of the few things upon which he, as it seems, felt himself justified in making offensive war. (*Eans vs. Bicknell,* 6 *Ves.* 186.) Both he and Mr. Justice *Grose* regarded the decision as violating the fourth section of the Statute of Frauds. And in this were they not right? When a Statute says that a promise to answer for the debt of another, shall not bind, does it not say that any less thing shall not bind? And a representation that a man is solvent, is a less thing than a promise to answer for the man's debt.

The decision was without a precedent; yet, cases like that in which it was made, must have been occurring with more and more frequency from the very birth of credit.

It is a decision which, as I conceive, was not true to what was the *real* understanding of the parties in the case; for if it had been the real understanding of the parties, that one should become bound to the other, they would not, I feel sure, have left a matter of so much importance unexpressed.

It is a decision which, as it strikes me, disregards the principle, that a loss occasioned by one's own negligence, is one's own loss—a principle which would have made the plaintiff, if he had been an executor, and the goods which he sold

on the credit of the naked representation had been assets, guilty of a *devastavit.*

It is a decision which has to assume, that every man is, without pay, under a *legal* obligation to every other man, to tell him, knowingly, nothing false.

It is a decision which practically violates the principle, that he who feels the benefit ought to bear the burden, for the form of action in which the decision was made being in *tort*, an effect of the decision was to make the defendant a *tort feasor*; and so, to prevent him from having the chance to re-imburse himself out of the party who got the goods on his representation, for no *tort feasor* is entitled to call on another person for indemnity; and yet, the action had to be in *tort*, for if it had been in contract, stating an implied promise, it would have fallen directly within the fourth section of the Statute of Frauds.

Whether a man is trustworthy or not, is matter of mere opinion. And if A says of B, that it is his opinion that B is trustworthy, the strong presumption of law is, that this is A's opinion; for A gains nothing whatever by saying that it is his opinion. And to prove that at the time of the statement B had no property, or even had no character, would be only to raise a strong presumption that the statement did not ex-press A's real opinion.

And this is certainly as much as can be proved in a vast ma-jority of the cases dependent on statements like this. The result is, that all that the plaintiff can do by proof in such cases, is to raise a strong presumption in his favor, and set it against the strong presumption which the law has raised in favor of the defendant. But of these two presumptions, the one in favor of the plaintiff will be a presumption of guilt; the one in favor of the defendant, a presumption of innocence. Now the decision in *Parley vs. Freeman*, being free to choose between these two presumptions, takes sides with that of guilt. True, the decision was on a demurrer to the declaration; and so, technically, was one which had no

reference to evidence; but still, in practice, it does this, or it is worthless.

Finally, Parliament, after allowing the decision to stand long enough to show the sort of fruit it would bear, laid the axe to its root. In the ninth year of *Geo. IV.* under the auspices of Lord *Tenterden,* Parliament passed an Act containing these words: "No action shall be maintained, whereby to charge any person upon, or by reason of, any representation or assurance made or given concerning or relating to the character, conduct, credit, ability, trade or dealings of any other person, to the intent or purpose that such other person may obtain credit, money or goods upon, unless such representation or assurance be made in writing, signed by the party to be charged therewith." (Note to *Chandelor vs. Lapers,* 1 *Smith's Leading Cases,* 63.) And this was done, says *Smith,* to prevent the Statute of Frauds from being trenched upon by this decision in *Pasley vs. Freeman.*