## D. G. McKEE v. J. F. RUDD and F. E. WEAR, Appellants.

### Division One, July 12, 1909.

1. **CORPORATIONS: Charter Representations: Creditors: Fraud and Deceit.** A creditor of a business corporation cannot rely upon statements made in its articles of incorporation, and upon proof of the falsity of those statements that two-thirds of its capital stock had been paid up, recover against the parties signing the articles, in an action for fraud and deceit.

2. ———: ———: ———: ———: **Making Charter Representations Their Own.** And where none of the incorporators who signed the articles told the creditor that the stock had been subscribed and paid as in the articles stated, he cannot recover from them in the action for fraud and deceit, upon the theory that they pointed to the articles and made their false statements their own representations. Declarations by the incorporators of what was the capital stated in the articles, of the amount subscribed for by various persons and of the amount paid thereon by each, being far less than the articles stated had been paid, do not amount to a representation that the articles spoke the truth.

McKee v. Rudd.

3. ———: **Oral Representations As to Corporation's Ability to Pay.** A creditor of a corporation cannot recover from its incorporators for false oral representations of its ability to pay made by them to him at the time he received the company's promissory note for $4,500. Such oral representations come within the Statute of Frauds. And the rule applies to the officers of the corporation.

4. ———: ———: .Statute of Frauds: **Waiver: By Pleading.** A general denial in the answer in a suit for fraud and deceit, based upon oral representations, raises the Statute of Frauds, and it is not waived by a further plea that defendant "denies that at any time, either directly or indirectly, he made any representations to said plaintiff with reference to the solvency of said corporation."

5. ———: ———: ———: ———: **By Not Renewing An Objection.** An objection once clearly made should stand for the whole trial. Where defendants, at the first appearance of testimony tending to show that plaintiff relied upon oral representations for a recovery, raises the Statute of Frauds as an objection, it is not necessary or seemly to be renewing the objection at every offer of the same kind of testimony.

6. ———: ———: ———: ———: **By Making Similar Proof.** Nor did defendants waive the Statute of Frauds by the fact that, after their objection that a recovery on oral representations would be violative of that statute, ·they proceeded to testify to their understanding of the same conversations.

7. ———: ———: ———: ———: **By Requesting Finding ·Upon All Testimony.** And where defendants have been forced by the adverse rulings of the court to put in testimony of the same character as that objected to by them and held to be incompetent, in view of the Statute of Frauds, they do not waive its incompetency by requesting a finding of facts based upon all the testimony.

8. ———: ———: ———: ———: **By Asking Instructions.** Nor did they waive the protection of the Statute of Frauds by asking instructions not including the statute.

9. ———: ———: ———: ———: **By Motion for New Trial.** Nor do they waive the protection of the Statute of Frauds by failing to mention the statute in their motion for a new trial, if the motion does assign as a ground therefor the admission of incompetent and improper evidence over their objection.

10. ———: **Fraud and Deceit: Liability of Officers.** A judgment creditor of a corporation, whose charter falsely recites that two-thirds of its capital stock is paid up, cannot, on the

ground that his judgment is a righteous one, recover against its officers who have not paid their stock in money or other thing of equivalent value.

11. **REVERSAL AS TO NON-APPEALING DEFENDANT.** The judgment was entered in an action in tort against both defendants, and both appealed, making a joint affidavit and a joint appeal bond, but one of them filed no abstract or brief. No case was made against either. *Held*, that, under the circumstances, to affirm the judgment as against the one who did not prosecute his appeal or to dismiss his appeal, would work a great injustice against the other, since recovery could then be had against the other on the appeal bond, and the judgment is therefore reversed as a whole, as to both defendants.

12. **CORPORATION: Fraud and Deceit Against Stockholders: Cause of Action.** It is of extreme doubt under the facts of this case, which is one for fraud and deceit against the stockholders of a defunct corporation, to compel them to pay a judgment against it, on the ground that they falsely represented that its capital stock had been paid up and that it had sufficient money to pay the note, whether or not the corporation received value for the note, and whether or not the petition states sufficient facts to make it good in an action for fraud and deceit.

## Appeal from Jackson Circuit Court.—*Hon. Frank P. Walsh,* Special Judge.

REVERSED.

*Chas. W. Webster* and *Francis C. Downey* for appellants.

(1) The court erred in compelling Wear to answer to the amended petition. The petition does not state a cause of action. Pier v. Heinrichoffen, 52 Mo. 333; Gamage v. Bushell, 1 Mo. App. 418; Sidway v. Mo. Land & L. S. Co., 163 Mo. 374; Hoester v. Sammelman, 101 Mo. 624. (2) The court erred in overruling the objection to the introduction of any testimony under the amended petition. The amended petition does not state facts sufficient to entitle plaintiff to any relief. Jones v. Steel, 36 Mo. 324; R. S.

1899, sec. 602; Elfrank v. Seiler, 54 Mo. 134; Paddock v. Somes, 102 Mo. 226; Anderson v. McPike, 41 Mo. App. 328; Donahue v. Bragg, 49 Mo. App. 273; Wilson v. Railroad, 67 Mo. App. 443.   (3)  The court erred in admitting in evidence, over defendant's objection, testimony that plaintiff relied on the statements of payments up of its capital stock contained in the charter of American Sand and Supply Company. Webb v. Rockefeller, 195 Mo. 57.

*W. W. Calvin* and *Bruce Barnett* for respondent.

(1)  The Statute of Frauds is no bar to respondent's case for the reason that the representations in question were made in writing and signed by appellant and the other defendants in the form of the articles of incorporation of the American Sand and Supply Company, to which articles appellant and the other defendants referred respondent, and to the representations set forth in which they called his attention. The case therefore does not come within the doctrine announced in Webb v. Rockfeller, 195 Mo. 57.   Hunnewell v. Duxbury, 157 Mass. 1.   In the case just above cited it was held that where an incorporator refers a person to the articles of incorporation the same then becomes as a representation made directly to that person.   (2)  The Statute of Frauds is inapplicable to this case for the further reason that the representations in question were made as to specific assets held by the corporation of which appellant and the other defendants were owners of practically the entire stock. Only in a technical sense, therefore, were the representations as to the dealings of a third party, but in fact and spirit same were as to their own dealings in their corporate capacity.   (3)  The evidence justifies the judgment and it is immaterial whether or not the findings of fact made by the trial court include all facts necessary to be found to entitle respondent to the

judgment as rendered. (4) It cannot be questioned that under the evidence respondent was entitled to recover. It has been held by this court that persons interested in a corporation are liable in damages when by false representations they induce another to extend credit to the corporation. Steam Stone Cutter Co. v. Scott, 157 Mo. 525; VanCleve v. Berkey, 143 Mo. 135; Hunnewell v. Duxbury, 154 Mass. 286; Fogg v. Pew, 10 Gray 409; Hindman v. Bank, 112 Fed. 931; Bradley v. Poole, 98 Mass. 169. The doctrine announced in the cases just above cited is recognized and referred to with approval in Webb v. Rockefeller, supra. (5) It is respectfully submitted that the judgment was for the right party, is amply supported by the evidence, that the cause was tried without error and the judgment should be affirmed.

GRAVES, J.—Defendants were the incorporators of a Missouri business corporation styled the American Sand & Supply Company. Defendant Rudd had filed application in the U. S. Patent Office for letters-patent for a certain mechanical device and process by which to remove sand from a river and load the same on to cars. To demonstrate the feasibility of his invention and pending his application for patents thereon, he contracted to build a plant at Tokepa, Kansas, for the Kaw River Sand Company, equipped with his invention or device for the price and sum of $10,000. Rudd seems to have had no means, and he induced plaintiff, McKee, to go in with him and furnish money to the extent of $5,000, with the understanding that McKee should be repaid out of the contract price and to share the profits of the venture which went to the construction and operation of the plant. McKee furnished in fact $5,025. These two parties also had a further written agreement, by the terms of which Rudd was to organize a two hundred thousand dollar cor-

poration to take in the "Rudd Sand Handling Apparatus and the Rudd & Meyers Portable Sand Plant" at the price and sum of $100,000, in full paid-up stock and in which proposed corporation the said McKee, in consideration of $2,000, was to have a 4-25 interest in the said inventions, which interest was to be taken in said corporation for one hundred and sixty shares of full paid stock of the par value of $100 per share. McKee was also to purchase five shares at $100 per share. McKee was to pay both the $2,000 and the $500, when the plant to be constructed at Topeka was in successful operation.

Rudd did not organize the $200,000 corporation, but instead he and his codefendants organized the corporation first herein named, having a capital stock of $300,000. It appears that for some reason they did not want McKee in the corporation, and it was finally determined that they would buy him out, so accordingly it was agreed between the officers of the new corporation, that such corporation should take over all of McKee's interest at the price of $5,500. The final culmination of the deal was a written contract of date January 13, 1904, although there had been a previous written contract on December 23, 1900, which was destroyed upon the execution of the January contract. By this last named contract McKee sold and assigned his interest in both of the written contracts which he had with Rudd, to the American Sand & Supply Company. The Topeka plant was only then partially constructed, but McKee had therein $5,025. McKee and Rudd both signed the contract, and as to the consideration to be received by McKee, who was in the contract designated as party of the second part, the contract reads:

"First party as a part of the consideration passing from it has this day paid to second party in cash the sum of five hundred dollars and has executed and has delivered to second party its two promissory notes,

one for five hundred dollars dated January 12, 1904, payable thirty days after date, without interest, and one for forty-five hundred dollars, dated January 12, 1904, payable on or before sixty days after date, with interest at six per cent per annum from date until maturity, and eight per cent per annum after maturity.''

The party of the first part was the American Sand & Supply Company, and Rudd was the third party, as the parties to the contract were designated. McKee was paid the $500 in cash and upon maturity was paid the $500 note. The $4,500 was never paid. McKee sued the corporation and got judgment, but an officer with an execution failed to find property.

Thereafter McKee filed a petition which was the origin of this suit. The petition upon which trial was had is an amended petition and the corporation is not a party. Under the first petition it was a party and a receiver was appointed, who qualified, but was later discharged. The receiver found no assets and upon the dropping out of the defendant corporation from the case, was likewise dropped out and directed to return what he had to the corporation.

Omitting caption the petition upon which the cause was tried reads:

"Plaintiff states that on or about the — day of December, 1903, defendants filed with the Secretary of State of Missouri, duly authenticated articles of incorporation, under the name and style of American Sand & Supply Company; and represented to said Secretary of State and the State of Missouri that said company had a capital stock of $300,000, and further represented to said Secretary of State and to the State of Missouri that of said capital stock $150,000, or one half thereof, was actually paid up in cash in good and lawful money of the United States; that upon the strength and belief of said representa-

tions, articles of incorporation were issued to said company.

"That in truth and in fact all of said representations were false, fraudulent, and untrue, and defendants and each of them then and there well knew that the same were false, fraudulent and untrue.

"That said pretended corporation was insolvent at that time, and said capital stock was not paid up nor any part thereof, which facts defendants and each of them well knew.

"That said pretended corporation never had any legal existence and no legal authority to do business as a corporation in this State, for the reason that said articles of association were procured by false and fraudulent representations, knowingly made by defendants as aforesaid; and that said pretended corporation had no assets and was insolvent from its inception, as defendants and each of them well knew.

"That defendants and each of them falsely and fraudulently represented to this plaintiff that said pretended corporation was a duly and legally organized corporation; that one-half of its capital stock, amounting to $150,000, was actually paid up in good and lawful money; that said company was solvent and was ready to comply with any and all contracts it might make and that it was amply able to meet any and all liabilities it might incur.

"That plaintiff, believing said representations to be true and relying upon them as true; and further relying upon the articles of association of said company, and the statements therein, was induced to extend credit to said pretended corporation and *did loan to said pretended corporation* the money for which the jugment hereinafter mentioned was obtained, and sued said company as a corporation as they purported and pretended to be.

"That plaintiff is a creditor of said company and pretended corporation and has judgment against it in

the sum of $4,570, with interest from the date of its rendition, and the same is still unpaid, and cannot be collected.

"That plaintiff contracted with said company, pretended corporation, in good faith, believing it to be what its articles of association warranted it was, viz.: solvent, and as so held out and represented to plaintiff by defendants, and each of them.

"Wherefore, in consideration of the acts, defaults and representations, knowingly, fraudulently, and falsely made by defendants as herein set out, plaintiff says he is damaged in the sum of $4,570, with interest from the — day of ——, 1904; he therefore asks judgment against defendants and each of them, jointly and severally, and as partners, in the sum of $4,570, with interest and costs.''

To this amended petition the defendant Wear (1) moved to strike it from the files for reasons in a motion stated, (2) moved to strike out certain redundant and irrelevant matter from the petition, and (3) moved to make the petition more definite and certain. All these motions were overruled and thereupon the following answer was filed by Wear:

"Comes now the defendant F. E. Wear, answering for himself alone the amended petition herein by the plaintiff filed:

"Protesting against the order of the court entered in this cause on the 14th day of January, 1906, ordering and directing this defendant to answer to the said amended petition, and objecting and excepting to said order compelling this defendant to answer a pleading so manifestly insufficient to be answered unto, as is the said amended petition herein filed by said plaintiff, and waiving no objection or exception that might be taken to said amended petition, though so answering, this defendant denies each, all and every the matters and things in said amended petition contained.

"Defendant admits, however, that the Secretary of State of Missouri issued to the American Sand & Supply Company a certificate of incorporation, and states that said American Sand & Supply Company now is, and at all times in said petition referred to was, a corporation duly incorporated and doing business under and by virtue of the laws of the State of Missouri.

"Defendant specially denies that at any time he made any representations whatsoever to said plaintiff, either directly or indirectly, as to the legality of the organization of said American Sand & Supply Company or as to the payment up of one-half of its capital stock, or any part thereof, in good and lawful money, or otherwise, and denies that at any time, either directly or indirectly, he made any representation to said plaintiff with reference to the solvency of said American Sand & Supply Company.

"Defendant further specially denies that said plaintiff at any time extended any credit to said American Sand & Supply Company or loaned any money to said American Sand & Supply Company, or that said plaintiff ever relied upon any representations made by this defendant with reference to the solvency of said corporation and so relying reloaned any money or extended any credit to said corporation.

"Whether plaintiff is a creditor of said corporation, and has a judgment against it in the sum of four thousand five hundred and seventy dollars, or for any other sum, this defendant has no knowledge sufficient whereon to found a belief, and this defendant does not know whether any such judgment, if the same exists, is unpaid and cannot be collected. Wherefore, defendant asks that if such allegation be material to the issues in this cause, plaintiff be compelled to prove the same.

"Wherefore, this defendant prays that he go hence without day, and recover his costs herein incurred."

Neither of the three motions hereinabove mentioned have found a place in the bill of exceptions, so far as the abstract shows. The abstract shows no answer for the other defendants, nor does it show a reply to the answer of defendant Wear. The trial, which was before the Hon. Frank P. Walsh, as special judge, proceeded as if reply had been filed. No jury was used. Trial resulted in judgment for plaintiff in the sum of $4,570, from which defendants Wear and Rudd appealed, after unsuccessful motions for new trial and in arrest of judgment.

The only abstract of record before us is labeled, "Abstract of Record, with complete Bill of Exceptions by Appellant, F. E. Wear," and this perhaps accounts for the absence of Rudd's answer in the record. No brief is filed here for Rudd, and we have filed in the case a motion to dismiss the appeal of Rudd for the reason of his failure to file abstract of record and brief within the time prescribed by law and our rules. Rudd acknowledges receipt of a copy of such motion. This motion we took with the case.

As usual the evidence was conflicting as to whether any statements or representations were made to plaintiff by the defendants concerning the solvency of the corporation. When the plaintiff sought to make this proof the following occurred:

"Q. Now, just state to the court what was said at that time by the defendants, or any of them; state what was said by each defendant, if you remember, regarding this company. I am talking about what was said regarding the company, the American Sand & Supply Company.

"*Mr. Downey*: Defendant Wear objects to the question because it is incompetent, irrelevant and immaterial, and because, under the Statute of Frauds in this State, any statement of that description would

be wholly inadmissible, and appears to call for parol testimony concerning the credit and financial standing of the American Sand & Supply Company and its ability to pay its debts.

"*Mr. Webster*: Defendant Rudd makes the same objection.

"Objection overruled by the court. To which action and ruling of the court the defendant, Wear, and the defendant, Rudd, at the time duly excepted."

Plaintiff it appears wanted the cash rather than the notes prior to the execution of the contract of date January 13th. The strongest evidence in the record for the plaintiff we shall quote. Plaintiff, in describing the representations made to him, among other things, said:

"Q. (Interrupting.) State his language, Mr. McKee. A. Well, as I stated to His Honor, a while ago, when Mr. Hutchings made the statement, Mr. Rudd acquiesced and said, 'Yes, that's so,' and Mr. Wear.

"*The Court*: That is, nodded his head up and down? A. Yes, sir.

"Q. State what Mr. Rudd said, if anything. A. He didn't say anything in language, any more than that, he said, 'Yes, that's so.'

"Q. Well, state all Mr. Hutchings said, state all that he said. A. Well, Mr. Hutchings said that the company was solvent, that he had $15,000 in stock in the company, in the treasury, and Mr. Rudd said that he had sold $1,600 to Mr. Armstrong, that they had at that time $16,500 in cash in the treasury, and Mr. Wear had taken ten thousand dollars worth of stock, and Mr. Peckham had taken twenty thousand, subscribed for twenty thousand, and Mr. Waltner, I believe it was, ten thousand, and there was some other names, but I can't remember them that were stated as having subscribed, taken stock in this company, and that this money would all be paid in, and by the time

this note would mature it would all be in to meet the note, but as they had these other plants in contemplation in these two cities, to erect the sand plants, they wanted to use this money that was already on hand for to start those plants and start their business going, and if they paid me, they would have to borrow money to carry on these other operations, and they might as well give me a note and pay me interest on it as to pay interest to anyone else.

"*The Court*: Now, let me understand. Who did you claim said that? A. Mr. Hutchings.

"*The Court*: Who was present? A. Mr. Rudd and Mr. Wear—they were all present and they all acquiesced in it.

"*The Court*: That is stricken out as not responsive.

"Q. State what they did or said? A. They nodded their heads in approval and said, 'Yes, that's so.' . . .

"Q. Now, Mr. McKee, just state to the court what conversation you had with Mr. Wear; if you had any conversation with him, state what that was, at this time? A. The conversation with Mr. Wear was in regard to my taking this note, this note for the claim, and, as I stated, I wished them to pay me in cash, instead of taking the note, and Mr. Wear says to me, he says, 'McKee, why don't you take that note?' and he says furthermore, 'You are a damned fool if you don't take that note.' He says, 'That note is all right and will be paid.' And he says, 'You take that note and I will see that it is paid.' And I should have stated that we went out of his office at that time and he made that—told me that in the—I believe it was in the safe—in the safe room. We stepped out into that, I believe, and he made that statement to me there. Then we came back into the office again and Mr. Hutchings says, 'Well, what are you going to do?' and I says I would like to have my cash, and Mr. Wear

says, 'McKee, you take that note; I will see it is paid,' and he looked me straight in the eye and I looked him straight in the eye, and I says, 'All right, I will take the note; you put the seal of the corporation on the notes.' They put the seal of the corporation on the notes and I took the notes.

"*Mr. Downey*: Now, I desire to move that all that portion of this answer which tended to show or prove that Mr. Wear orally said that he would see that note was paid be stricken out.

"*The Court*: That motion is sustained. That will be stricken out; I will not consider that."

Later in explaining the portion stricken out the court said:

"*The Court* (interrupting): I have stricken out that portion of the testimony where he stated he stepped into the vault part of the office with Mr. Wear and where Mr. Wear assured him individually that he would see the note paid. I mean that part of the conversation. I do that so you will know what I am taking into consideration to base my finding on, whatever it is."

Then the plaintiff proceeds:

"Q. I want to ask you this question, whether or not anything was said to you regarding the articles of incorporation at all? A. Yes, sir.

"Q. By these defendants? A. Yes, sir.

"Q. State which one of them said it and what he said? A. Why, they all told me that they were incorporated.

"Q. Did you know for what amount? A. $300,000.

"Q. How did you know that? A. They said so.

"Q. What further was said about this money or stock being paid up, if anything? . . .

"Q. What was said by any of these defendants regarding the amount of stock paid up, what was said

by any one of them, and who it was, and what he said?
A. Well, Mr. Hutchings said that he had paid for
$15,000 of stock and Mr. Rudd said that Mr. Armstrong had paid for—had paid $1,600 for 3,000 shares
of stock, and that these other parties had subscribed
for stock, and that it would be paid and to assure
me of the positiveness of the note being paid he said,
'Why, Mr. Wear has—'

"*The Court* (interrupting): That will be stricken
out.

"Q. Just state what he said and leave out the
other part. A. Mr. Wear says—Mr. Hutchings says,
'Why, Mr. Wear has taken ten thousand dollars of
stock, and that is as much again as your claim
amounts to, and that is a perfect guaranty to you that
the note will be met when it is due; Mr. Wear, president of the Wear Coal Company, you are not afraid of
him, are you?'

"Q. Was Mr. Wear present at that time? A.
Mr. Wear was present at that time when Mr. Hutchings made that statement, 'You are not afraid of him,
are you?' and Mr. Wear looked at me and smiled, as
much as to say, 'Why, Mr. McKee—'

"Q. Never mind about that. Just state what was
said. A. 'Mr. Wear's stock alone is as much more
as your note and is amply sufficient to meet your obligation.'

"Q. Now, what was said, if anything, respecting
what he had in it? A. He said that he had fifteen
thousand dollars and he had that in—had subscribed
five thousand more.

"Q. What had you to do with organizing this
corporation? A. I had nothing at all."

A witness, McCoy by name, describes the talk
thus:

"Q. Now, Mr. McCoy, just state what you heard
there between the parties, plaintiff and defendants,
and who said it? A. Mr. Hutchings made the proposi-

tion to Mr. McKee to purchase his interest by the giving him of a note for $500, $500 in cash, the note for $500 due in thirty days, and a note for $4,500 due in sixty days, for the purchase of his interests in the contract he had with Mr. Rudd. Mr. McKee asked them if they had intended to give him the money instead of the notes, and they said that they had the money—

"*Mr. Downey*: Wait a minute. We object to that as incompetent, irrelevant and immaterial.

"Q. Who? A. Mr. Hutchings said that they had the money, but owing to their obligations, which they expected in the construction of other plants, and the finishing of this plant at Topeka, which they expected to take over, that they had not the money then on hand, and with the extension of sixty days' credit by Mr. McKee they would have time to get the money to meet his obligation when due.

"Q. Mr. McCoy, what did they say—what was said by these defendants, or any of them? State what each one of them said, if they did say anything, with respect to this corporation that was about to purchase this interest from Mr. McKee? A. Mr. Hutchings told Mr. McKee that the note that he would take was perfectly good, that the note they had offered him was good for the simple reason they had the money, but he said—then Mr. McKee asked him in case he took his note, if they would put their personal indorsement upon it, and they says no, that it wouldn't increase the value of the notes at all, that the note as given by the corporation with the signature of Mr. Hutchings as treasurer and secretary and Mr. Wear as president would make it just as good as though it had their personal indorsements.

"Q. What was said, if anything, regarding this corporation? That is, its paid-up stock, or capital stock, or whatever it was? A. Mr. Hutchings said that he had subscribed for $15,000 of the stock and had paid for it, and it was his intention to subscribe

for another additional $5,000; that Mr. Beckham had subscribed for $20,000.

"Q. Was there anything said regarding Mr. Beckham, about who he was at that time, do you remember? A. No, I don't think—not that I know of.

"Q. Now, what else did Mr. Hutchings say, if anything, that you remember? A. He said that—Mr. Hutchings said that this stock being subscribed as it was, that the money was ready for them whenever they had the stock ready to deliver to these parties and demanded the money, that it was the same as cash to them, but it would take a few days for them to get that money in for the stock, consequently they didn't wish to spend out all the money they had at that time for payment of Mr. McKee in cash.

"Q. Was there anything else that Mr. Hutchings said that you recall now at this time? A. At the taking of these notes?

"Q. Anything else that he said concerning this corporation, its ability, etc., anything further than you have stated? A. Only that it was perfectly solvent and able to take care of any obligation that it would make.

"Q. Can you recall the language that he used? A. That is the language that he used. 'This corporation is perfectly solvent and capable of taking care of any obligation that they might make.'

"Q. Was there anything said by Mr. Hutchings—

"Mr. Downey (interrupting): I understand, if your Honor please, of course that all this goes in subject to the objection we made to the same class of testimony that Mr. McKee testified to.

"The Court: No, I didn't understand that.

"Mr. Downey: Then we move to strike out all the testimony of this witness which has reference to any verbal statements made by any of these parties at the meeting in the office of Mr. Wear with refer-

ence to the solvency of the corporation; we move to strike it out for the reason that it is incompetent, irrelevant and immaterial, and does not tend to prove any of the issues in this case, and for the further reason that the petition does not state any cause of action predicated upon statements of that kind.

"*The Court*: I can't rule on this until he finishes the cross-examination. Let the record show that all the proper objections were made to all this testimony and I will let the ruling go back.

"To which action and ruling of the court the defendants at the time duly excepted.

"Q. Was that all that Mr. Hutchings said, Mr. McCoy, that you can recall? A. That is all that Mr. Hutchings said that I recall.

"Q. Was there anything said about this corporation, about its capacity, that is, the size of the corporation and the number of shares, or things of that kind, capitalization? A. Why, he stated that they were incorporated for $300,000, was all the statement about the corporation.

"Q. Did he state where they were organized, under the laws of what State they were incorporated? A. That they were organized under the laws of the State of Missouri for that amount.

"Q. Now, do you recall anything that Mr. Rudd said at that time? A. No, I don't. Mr. Rudd didn't have anything to say.

"Q. I will ask you who was present when these representations were being made? A. Mr. Wear, Mr. Rudd, Mr. Frank Wear, Mr. Rudd, Mr. Hutchings, Mr. Armstrong and Mr. McKee.

"Q. I will ask you if anything was said there at that time about one Mr. Armstrong having paid in some money to the corporation? A. Mr. Armstrong was issued a stock certificate at this meeting.

"*The Court*: I will sustain Mr. Downey's objection to all that testimony, except the statments that

were said to have been made there that the company was solvent and that it was capitalized for $300,000.

"Q. Do you recall the circumstances, Mr. Mc-Coy, of Mr. McKee and Mr. Wear going into a near-by room? A. Mr. Wear got out of his chair and says: 'Mac, step out, I want to speak to you,' and they went out of the door. I don't know where they went.

"Q. Do you remember of them coming back? A. Yes, sir.

"Q. What was said when they came back, if anything?

"*Mr. Downey*: That is objected to as incompetent, irrelevant and immaterial. Objection overruled by the court. To which action and ruling of the court the defendants at the time duly excepted.

"A. Mr. Wear said: 'Mac, you'd better take that note,' and then following up on the objection of Mr. McKee, he says, 'Well,' he says, 'I'll take the note if you'll indorse it personally.' Mr. Wear says: 'Mac, that wouldn't add one iota's value to the note, because it is just as good as though we indorsed it personally.' He says, 'You will be a fool if you don't take that note.' He says, 'You take it and I will see that it is paid.'

"*Mr. Downey*: We move to strike out all this answer for the reason it is incompetent, irrelevant and immaterial.

"*The Court*: Let that last be stricken out."

The evidence for the defendant was to the effect that no statements were made as to the solvency of the corporation and no statements as to stock purchases, except that Hutchings had bought and paid for $10,000 worth of stock and was going to take $5,000 more, and that one Armstrong had bought some and paid $1,600 thereon; and that others had spoken of buying. This sufficiently states the case for a disposition of the questions raised, with the exception of some

matters which can be more appropriately noted in the course of the opinion.

I. Taken in the broadest sense, the proof which we have purposely quoted at some length tends to show, as plaintiff claims, (1) that the incorporators of the American Sand & Supply Company imposed upon the Secretary of State in procuring their charter and that plaintiff relying upon the representations of the charter, was deceived, and extended credit to said corporation, by reason of which he lost his money and was defrauded; (2) that defendants pointed to the charter and thereby made the representations of the charter their own representations, and (3) that defendants knowingly and falsely misrepresented the standing and condition of the corporation to which plaintiff was induced to extend credit. Of these in their order.

In this paragraph we shall take the first, and in separate paragraphs follow with the other contentions.

Under the proof, the charter of the corporation showed that two-thirds of the capital stock thereof had been ''actually paid up in lawful money of the United States,'' whilst the records of the corporation shows that it was paid up by assignments of patents then applied for, but not yet granted. Now segregating this proof from all other proof which go to the other questions suggested, was this sufficient to take plaintiff's case to the jury? It must be borne in mind that defendants interposed demurrers to the testimony, both at the close of the plaintiff's case and at the close of the whole case. The question then is under this branch of our inquiry, can a creditor rely upon statements made in the articles of association filed by a business corporation, and upon proof of the falsity thereof be permitted to recover against the parties signing the articles of incorporation in an ac-

tion for fraud and deceit? Defendants in this case were all signers of the articles of association, which recited that two-thirds of the stock, *i. e.*, $200,000, had been paid in actual cash. As a fact it had not been so paid, but had been paid as above indicated. The value of the assigned patents, which had only been applied for at the time, is a question of dispute by the evidence. Nor does it appear that patents were ever issued, except by the naked statement of counsel.

These representations, whether false or true, were not made to the plaintiff. These were representations made to the Secretary of State to procure a certificate of incorporation, and not to the plaintiff to secure credit. This whole matter has been so thoroughly gone over by this court, that it would be useless to review the case law. It has been fully reviewed in Webb v. Rockefeller, 195 Mo. 57, which case disapproves, of Hyatt v. Van Riper, 105 Mo. App. 664, on this question. The Webb case was passed upon March 29, 1906, and this case was tried prior thereto. The learned trial judge was evidently trying to follow the Hyatt Case, *supra,* and was thereby led into error.

So that in view of the Webb Case it must be held that the plaintiff could not rely upon the bare statements of the articles of association for false statements upon which to predicate an action for fraud and deceit. This for the reason that such statements were not made to him for the purpose of securing credit, but to the Secretary of State to procure a corporate charter. The cases are reviewed in the Webb Case and we shall not go further here. The case of Hunnewell v. Duxbury, 154 Mass. 286, elaborates the question and might be read with interest.

II. Passing now to the second question in our paragraph one suggested, how stands plaintiff's case? In discussing the question which we have just dis-

posed of in our first paragraph, the Supreme Court of Massachusetts in Hunnewell v. Duxbury, 157 Mass. 1, reached the same conclusion that this court reached in the Webb Case, supra, but at page 6 of that opinion the court, in speaking of what was and what was not said in a conversation out of which grew an extension of credit, uses this language:

"Assuming that the statement of Dowd 'that they had filed a declaration and were now prepared to go on and push the business of advertising,' referred to the certificate of August 11, 1885, the statement was not of such a nature or made under such circumstances as to justify a finding that it was intended or designedly allowed by him or by the other defendants to influence or deceive the plaintiff into accepting the notes. If he had said in substance or in terms, 'If you wish to know the standing of the corporation, it has filed a declaration at the State House, which you can examine,' the case might have stood differently, at least as to Dowd. But the subject of the conversation was not the financial standing of the corporation, or the amount of the capital stock, or the manner in which it had been paid in or invested, but the nature and operation of its mechanical devices and the probability of their successful use. The evidence discloses no other reference to the certificate on the part of any of the defendants, and to draw from this incidental mention of the fact that it has been filed, an intention on the part of Dowd or of any of the defendants to induce or allow the plaintiff to be influenced by its statements as to the amount and payment of the stock, would be unreasonable. The jury would not therefore have been justified, by all the circumstances which the evidence tended to show, in finding that the defendants intended by means of the representations contained in the certificate to influence the conduct of the plaintiff with reference to his claim against the corporation, and under the rule

laid down in the former opinion, the presiding justice was correct in not allowing this contention of the plaintiff to be passed upon by the jury.''

It will be noted that the language here used was largely *arguendo*, and really *dictum*, because the question was not involved. Upon this case, plaintiff clings with tenacity, and especially to that portion of the remarks, ''If you wish to know the standing of the corporation, it has filed a declaration at the State House, which you can examine.'' He overlooks paragraph two of the same opinion which we shall quote and comment upon in our succeeding paragraph.

But applying the evidence in the record to the sole question we now have in hand, it is altogether insufficient. Plaintiff had never read the articles of association. The most he says is that he saw some papers on the table which he took to be the articles of association. He does say that he understood that the corporation was a Missouri corporation; and that it had a capital stock of $300,000, but at no place does he say that defendants or either of them told him that the stock had been subscribed and paid as in the articles of association stated. No claim by plaintiff that defendants said, ''Here are our articles of association and the statements therein made as to the payment of the capital stock are true.'' We are not saying that such statement, had it been made and proved to be false, would have been actionable, in view of what shall follow herein, but make the suggestion to show that the case at bar does not fall within the supposed case made by the Massachusetts court. In fact, in view of the conclusion finally reached by that court in the Hunnewell Case, we do not deem it material whether the statements were made one way or the other. In this case, however, the proof does not point to the fact that defendants or either of them said, ''Here are the articles of association. They speak the truth as to our financial ability. You read them.''

Nor does the proof tend to show that they or either of them used words to that effect. The whole conversation was as to what had been subscribed and paid in by different parties which strongly tended to show an adverse condition from that shown by the articles of association.

Upon this point we hardly think the plaintiff was entitled to go to the jury.

III. Casting aside the articles of association, all the representations as to the present ability of the company to pay its debts were oral statements. Not a line was in writing nor signed by either of the defendants. Our statute, Revised Statutes 1899, section 3422, reads:

"No action shall be brought to charge any person upon or by reason of any representation or assurance made concerning the character, conduct, credit, ability, trade or dealings of any other person, unless such representation or assurance be made in writing, and subscribed by the party to be charged thereby, or by some person thereunto by him lawfully authorized."

This statute is of English origin and has found its way into the statutes of many of our States. Its purpose is a beneficial one. It withdraws from the public the temptation of saying that we would not have credited A, except for the fact that B said he was solvent, unless the representation of B was in writing. PHILIPS, P. J., speaking for the Kansas City Court of Appeals in Weil v. Schwartz, 21 Mo. App. l. c. 385, has well said of this statute:

"The history of the first enactment of this statute by the English Parliament furnishes most persuasive proof that its designs and purpose were to cut up by the roots the great evil of the frequency and success of such actions based on mere loose verbal representations, by requiring the action to depend exclusively on

the written undertaking, duly signed, by the party sought to be held. [See Lyde v. Branard, 1 M. & W. 101; Parke B.; 1 Smith's Lead. Cas. (4 Ed.), 144-146; Savage v. Jackson, 19 Ga. 305.] As said by BENNING, J., in the case last cited: 'When a statute says that a promise to answer for the debt of another, shall not bind, does it not say that any less things shall not bind?' I cannot understand how under this statute, if a part may rest upon a verbal representation, why the whole may not. If a part may be verbal and a part in writing, how much of each is essential to make the sum total of the *causa injuria*? Where shall the dividing line be drawn? The tendency of such a rule would be to invite the substitution of judicial discretion, and the caprice of the triers of the fact, for the more certain and explicit rule of the statute, until by imperceptible strokes of the keen blade of judicial construction, in ready hands, the purpose of the statute would either be whittled away altogether, or so weakened as to afford little protection against the very evil Lord Tenderden sought to uproot.''

Nor is the rule different as to the officers of a corporation under the terms of this statute. The representations of such parties are upon the same basis as others. Massachusetts has a similar statute, and in Hunnewell v. Duxbury, 157 Mass. l. c. 6, upon a second appeal of that case, the court said: ''It is well settled that representations made by officers of a corporation with reference to its financial standing or means are made with reference to the credit or ability of another person within the meaning of the Pub. Sts., c. 78, par. 4. [Kimball v. Comstock, 14 Gray 508; Wells v. Prince, 15 Gray 562; Mann v. Blanchard, 2 Allen 386; McKinney v. Whitting, 8 Allen 207.] The plaintiff does not deny the correctness of this proposition, but contends that a statement that another person is possessed of certain

specific property does not come within the provisions of the section, and need not be in writing in order to be actionable. We cannot accede to this proposition. The statute is a general one, purposely broad in its terms, and intended to prevent an understood mischief. It is to be so construed as to make it effectual to prevent the fraud at which it was aimed. To exclude from its operation statements as to the ownership of specific property, if made concerning the 'credit, ability, trade, or dealings' of another who is said to be the owner of the specific property, would deprive it of force. The statements of the defendants, except the certificate, were all oral, and all related either to the assets and property of the corporation, or to its prospects of success. The latter were under no circumstances actionable, being necessarily matters of opinion. To the former the Statute of Frauds applies, and prevents the plaintiff from recovering, because they were merely oral, and not in writing."

See also the case of Koch v. Sumner (Mich.), 108 N. W. 1. c. 725.

A statute could not be broader in terms than is ours. It was enacted for the purpose of relieving parties from uncertainties of litigation which might follow loose language, by requiring all statements to be in writing before the same should be actionable. In this case counsel recognize the extent of the statute as fully as we have done, but undertake to argue that there has been a waiver thereof. At this point suffice it to say that unless there has been a waiver of the statute no case was made by the plaintiff, because none of the alleged representations were in writing. The question of waiver we take next.

IV. There is no plea of the Statute of Frauds, or of that section claimed to be a protection to the defendants. It is not claimed, however, that the Stat-

ute of Frauds has to be pleaded, but it is admitted that a general denial is sufficient to raise the statute. The plaintiff urges that there was a waiver of the statute, and this he says occurred in several ways: (1) by the peculiarity of the answer filed, (2) by the failure to make proper objections to the testimony offered in the course of the trial, (3) by the defendants voluntarily testifying to the conversations, (4) by requesting a finding of facts upon their testimony, (5) by requesting declarations of law not including the statute, and (6) by a failure to mention the Statute of Frauds in the motion for new trial.

(a) In the answer is a general denial and this, it is admitted, is sufficient to raise the statute, but for other language used later in the answer. The language relied upon is, "and denies that at any time either directly or otherwise, made any representation to said plaintiff with reference to the solvency of said American Sand & Supply Company." We are not of opinion that this language following in a separate paragraph of the answer is sufficient to rob the defendants of the full benefits secured to them by the first paragraph of the answer which was a general denial pure and simple.

(b) At the first appearance of a witness, the plaintiff McKee, to testify to oral statements, the defendants objected and planted themselves behind the statute. We have set out the objection in the statement and will not repeat. The objection was again renewed when witness McCoy was on the stand, but after much of his testimony was in, but the trial court said, "I can't rule on this until he finishes the cross-examination. Let the record show that all the proper objections were made to all this testimony and I will let the ruling go back."

So that from the record the point was well preserved. When upon the first appearance of improper testimony the counsel raises the Statute of Frauds,

and his objection on that ground is then overruled, he is not required to continuously interpose a like objection to all similar testimony. A point once clearly made should stand for the whole trial. To continuously object to the same character of testimony after the trial court has said it was proper, approaches disrespect for the ruling of the court. The defendants at the first opportunity made clear their position and were not bound to continuously worry the trial court with objections which had once been overruled.

(c)   Nor did they waive the objection to such oral proof by afterward voluntarily testifying to the alleged conversations. Defendants had urged that plaintiff was not entitled to make proof of his allegations by parol evidence, but their objections to oral proof was overruled. It will not do to say because, after this ruling of the court, they then testified to their understanding of the same conversation, they thereby waived the question as to the validity of oral proof. Waiver is a voluntary act, and is not an act forced upon a party by the court. After the court ruled that parol evidence was proper, then it would be unfair to say that defendants could not give their version of the conversation without waiving their rights under the objection first interposed.

(d)   Nor was there a waiver by requesting a finding of facts based upon all the testimony. If the court by wrong and adverse rulings forced the defendants to put in testimony that they would not have put in but for the adverse ruling, and which they were, in justice to themselves, forced to put in by reason of such adverse ruling, then there is no waiver by the mere fact that the defendants asked a finding of facts based upon the whole evidence. By wrong and adverse rulings the court had fixed the plane upon which the battle was to be waged, and it illy becomes one who has received the benefits of such rulings to cry waiver.

(e)   What we have just said applies with equal force to the next contention, that there was a waiver by reason of requests for declarations of law.

(f)   Lastly it is said that the motion for new trial fails to mention the Statute of Frauds. Grant this to be true, but the motion does allege that the court admitted improper and incompetent evidence over the objections of the defendant, which is sufficient without seeking further for other grounds. As we are impressed by this record there is nothing waiving the Statute of Frauds.

V.   Finally the plaintiff urges that inasmuch as the defendants were officers and stockholders of the corporation, and had not paid their stock in money or anything equivalent thereto, his judgment is a righteous one and should be sustained. In support of this we are cited to the following cases: Steam Stone Cutter Co. v. Scott, 157 Mo. 520 l. c. 525; Van Cleve v. Berkey, 143 Mo. l. c. 135; Hunnewell v. Duxbury, 154 Mass. 286; Fogg v. Pew, 10 Gray 409; Hindman v. First Natl. Bank, 112 Fed. 931; Bradley v. Poole, 98 Mass. 169.

All of these cases were discussed and reviewed in Webb v. Rockefeller, supra. The two Missouri cases were actions against stockholders of a corporation by creditors, the gravamen of the charge being that they had not paid up their stock. They were not actions for fraud and deceit as is this case, if in fact the petition herein states a good cause of action at all. In this case the defendants are not sued as stockholders who had not paid up their stock, for Wear had only one share of the par value of $100, and now has a judgment against him for nearly $5,000. There may be some language in Steam Stone Cutter Co. v. Scott, 157 Mo. l. c. 525, wherein this court made some remarks which were beyond the scope of the case and as such should be considered *obiter dicta*. The whole

matter is so thoroughly and to our mind properly covered in the Webb Case, supra, that we dismiss it without further comment. Under these views the judgment as to the defendant Wear must be reversed.

This leaves but one question, and that is what should be the action of the court upon the motion to dismiss the appeal of defendant Rudd? That question we take next.

VI. As suggested in the statement the defendant Rudd does not appear here by brief. The abstract of record is here, but under the name of F. E. Wear, appellant. This abstract prints the bill of exceptions in full. The action is one in tort wherein in law one or all might be found liable. The record is such, however, that if a jury found against one defendant, it would be hard to find in favor of the other. Under the evidence all the talk as to the condition of the corporation was by one Hutchings, and it is claimed that Rudd and Wear assented to what he said, either by gesture or word of mouth. When the judgment was entered, both Rudd and Wear appealed, filing a joint affidavit of appeal. During the whole trial, each of them by their respective counsel made the same objections and preserved the same exceptions. When they came to appeal, they jointly appealed, and each of them signed the appeal bond, with two sureties thereon. To affirm this judgment as to Rudd, or to dismiss his appeal as prayed, which would amount to the same thing, would work a great injustice. From what we have indicated no case was made either against Rudd or Wear, yet if we dismiss Rudd's appeal, Wear and the other parties would be liable on the bond for the sum of this judgment. Wear could in no way have compelled Rudd and his counsel to follow up their appeal, but when we have all the facts before us, as we have, should we, after finding that there is no liability upon either defendant, yet leave

the case in such condition that the successful defendant would be liable for the full judgment? We think not. Rudd's act in failing to prosecute his appeal amounts to a fraud in law upon Wear. If Rudd is so anxious to have judgment go as against him he can yet submit to such a judgment in the lower court, at a time and in a manner that will not work grave injustice to another.

There might be drawn from the facts before us other reasons for refusing this motion, but we prefer to put it upon the broad ground that we will not permit a legal fraud to work an injustice in this court, where we have full control of the case as well as of our own rules.

The judgment as a whole is therefore reversed.

We feel better satisfied with this result each time we read the petition and the evidence. It is extremely doubtful whether or not the petition states facts sufficient to make it good in an action for fraud and deceit, and under the whole evidence we are convinced that plaintiff was not seriously misled as to the character of corporation with which he was dealing. Further, whilst he had a judgment against the corporation for the full amount of his note, it is not clear that the corporation received value received for the note.

Plaintiff's money had been expended long before he dealt with the corporation, and at the time he only parted with his equity in the sand plant at Topeka, and his right to go into a corporation of the character of the one we now have under consideration. Just what these rights parted with by plaintiff were worth is not made wholly clear by the record.

Let the judgment as to both defendants be reversed. All concur.