HINDMAN v. FIRST NAT. BANK OF LOUISVILLE et al.

(Circuit Court, D. Kentucky. February 15, 1898.)

1. REPRESENTATIONS BY BANK—CORPORATE POWERS.
    Representations by a bank that an insurance company has a certain amount of paid-up capital stock and surplus, are ultra vires.

2. SAME.
    Representations by the officers of a bank to an insurance commissioner, that an insurance company had on deposit in such bank a certain amount which had been paid in as capital stock and net surplus, are not ultra vires.

3. FALSE REPRESENTATIONS—LIABILITY TO THIRD PERSONS.
    A bank whose officers make false representations to an insurance commissioner, concerning the amount which an insurance company has on deposit with it, whereby the commissioner is induced to issue a license, is not liable to a third person who was induced to purchase shares in the company by the fact that such license had been granted.

Phelps & Thum and Abbott & Rutledge, for plaintiff.
Humphrey & Davie and Dodd & Dodd, for defendants.

BARR, District Judge. This is a reformed petition filed by order of the court, and there is a motion to strike out part of it, and a general demurrer filed by the First National Bank, one of the defendants. The grounds of the demurrer are that the facts are not sufficient to constitute a cause of action against the bank, and that the matter complained of in the bill is in excess of the powers conferred upon the defendant bank in its charter, and there cannot be a cause of action against it. It seems from the allegations of the bill that the plaintiff purchased from one C. B. Sullivan, who was an officer of the Columbian Fire Insurance Company, 80 shares of the stock of the said insurance company on the 6th day of February, 1893, for the sum of $10,000 cash; and the purpose of the bill is to recover from the defendants the First National Bank, Hart, and Sullivan the $10,000 thus paid to Sullivan for the stock sold. The basis of this claim is that Hart and the others combined and confederated together to deceive the insurance commissioner of Kentucky, and did deceive him, and by their deceptions induced him to grant a license to said insurance company to do business. The particular allegations of false representations, so far as the bank is concerned, are these:

"The plaintiff further states that shortly before or on or about the 1st day of January, 1893, certain persons associated themselves together for the purpose of establishing and organizing a fire insurance company under the laws of the state of Kentucky, to be known by the name of the 'Columbian Fire Insurance Company of America,' and for that purpose said persons duly executed and acknowledged articles of incorporation, which were duly recorded and filed with the secretary of state of Kentucky as required by law. * * * Said Columbian Fire Insurance Company of America, being so incorporated, applied to the commissioner of insurance for a license to do business in the state of Kentucky as a fire insurance company, and the said company purporting to have

a capital stock of two hundred thousand dollars and a surplus of fifty thousand dollars. Said commissioner of insurance for the state of Kentucky, on being so applied to, entered upon an investigation of the affairs and conditions of the said company to ascertain whether or not it was entitled to receive a license to do business as a fire insurance company, as he was so required to investigate by the laws of the state of Kentucky and in the performance of his duty. During the course of said examination the said Columbian Fire Insurance Company of America falsely represented to the said commissioner that its capital stock of two hundred thousand dollars had been in good faith subscribed for and paid up in full in cash, and that in addition thereto it had on hand a surplus of $48,182.90, or a total of $248,182.90, which it claimed and represented to said commissioner that it then had on hand as cash assets, being said capital stock and surplus paid in, in cash, and that the same was free of all debts and pecuniary obligations. The said sum of $248,182.90 was by said insurance company represented to said commissioner to be on deposit to the credit of said insurance company in the First National Bank of Louisville, and subject to the check of said insurance company. The said insurance commissioner, desiring to verify the statements and representations of the said insurance company, applied to the said First National Bank on the 31st day of December, 1892, and through its officers sought to ascertain whether or not the said insurance company had on deposit with said bank the said sum of $248,182.90; and the officers of said bank, knowing the purpose which said commissioner had in view in seeking said information, caused the cashier of said bank to give said commissioner a sworn statement to the effect that the said insurance company had on deposit with said bank on said day the aforesaid sum of $248,182.90, which had been paid in as the capital stock and net surplus of said company; and the said commissioner of insurance, believing and relying on the said statement so given to him by said bank, on the faith thereof issued to said insurance company a license to do business as a fire insurance company in Kentucky; and, on the faith of said license so issued by the insurance commissioner of Kentucky, the said insurance company was enabled to and did acquire license to do business as a fire insurance company in Kentucky, and in various other states of the United States, and at once proceeded to carry on said business and issue policies of insurance against loss by fire in Kentucky and elsewhere, and to advertise and hold itself out as a solvent insurance company, with a paid-up capital and surplus amounting to $248,182.90. Plaintiff says that the sworn statement made by the cashier of the First National Bank of Louisville on the 31st day of December, 1892 (which was made in the regular course of his duties and with the knowledge of and by the direction of his superior officers and the directors of said bank), and on the faith of which the insurance commissioner of Kentucky issued a license to the said Columbian Fire Insurance Company of America, was untrue, and was given for the fraudulent purpose of enabling the said insurance company to deceive said insurance commissioner, and obtain a license to do business when it was not lawfully entitled to one. The plaintiff avers that the officers of said insurance company and said bank, and the said C. B. Sullivan, A. W. Hart, E. L. Butler, and James R. Skinner, fraudulently conspired and confederated together, and co-operated with said bank, in its fraud herein set forth, to deceive said insurance commissioner, and did deceive him, and by their deception induced him to grant a license to said insurance company, and thereby set on foot said fraudulent insurance company."

It is alleged that the consideration for the making of these false representations by the bank was the agreement of the insurance company to make deposit with the bank of all of its moneys, which deposit would be and was valuable to it. It is further alleged that the insurance company, by reason of not having a full paid up capital stock, became insolvent in the spring of 1894, and the complainant lost his entire stock, as the assets of the company will pay its creditors only a small percentage of its debts.

There is no allegation in the bill that there was not really at the

time to the credit of the insurance company the sum stated, but it is alleged that the insurance company did not have full and immediate control of these deposits. It is also alleged that $25,000 of the deposit was made up by a certified check issued by a New York bank under an agreement that the money was not to be withdrawn from that bank until after the company was a going concern and had received premiums, and that it was not actually paid until some two months thereafter; and it is alleged that these deposits were made up in part by the bank discounting notes of stockholders given for the stock itself, which were indorsed by the insurance company, and that in fact the whole of the capital stock and surplus was not fully paid up at the time; that the capital stock, to the extent of something like $100,000, was never paid up. It is also alleged that the complainant relied upon the fact that the license had been granted to the insurance company to do business by the insurance commissioner of Kentucky. Knowing that the law required the capital stock to be paid up, he relied upon that fact, and was induced thereby to buy this stock from Sullivan, in February, 1893, paying therefor $10,000 cash. But it is not alleged that the national bank or any of its officers made any representation to him whatever, nor is it alleged that the complainant had actual knowledge of the representations which are alleged to have been made by the cashier of the First National Bank to the insurance commissioner at the time of his purchase of the stock. The Kentucky statutes (section 622) provide that "no insurance company shall be authorized to commence business until the minimum amount of capital stock named in the articles of incorporation has been subscribed and actually paid in." There are other allegations in the bill which seemingly allege that after the license was granted to the insurance company the bank united with that company in making publications as to its having a paid-up capital stock and surplus of $218,182.90. But this allegation is obscurely made, and it was not presented by counsel on the oral argument as one of the grounds upon which the liability of the bank was claimed. But, if it be conceded that this allegation is definitely made, we think that such a declaration was certainly beyond its corporate powers, and would be ultra vires, and need not be further considered in the consideration of this question. See Dresser v. Bank, 165 Mass. 120, 42 N. E. 567.

The reformed bill is quite difficult of construction, and somewhat ambiguous in its allegations, but I think the foregoing statement includes all that is material to the consideration of the questions under submission. It is insisted by the demurrant that the representations made by the cashier or other officers of the First National Bank, as alleged, were beyond its corporate powers, and that the bank is not, therefore, liable for any injury caused to the complainant thereby; and, secondly, that if these representations as alleged were false, and are within the corporate powers of the First National Bank, and that it is clearly alleged to have been to deceive Mr. Duncan, the insurance commissioner, into granting a license to the insurance company, still the defendant bank is not liable

for any injury which might arise to the complainant for the loss of his stock in the insurance company thus licensed, because there is not a sufficient connection between the false representations to the insurance commissioner and the loss by the complainant of the value of the stock to authorize a recovery.    We will consider these propositions in their order.

Among the powers given by the national banking act to its board of directors or its authorized officers or agents are "all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange or other evidences of debt; by receiving deposits," etc.    As the First National Bank had the right to accept the deposits of the insurance company, it would seem to follow, as an incident to receiving deposits, that the cashier might state orally or in writing, to those authorized to inquire, the amount of the deposits and the nature of the deposits,—whether on account of capital stock or surplus or whether a general deposit.    That far he was acting under the corporate powers and in the usual course of his business.    He had also the corporate power, in the course of his business, to state more than what the books of the bank showed, if he personally knew the fact, or assumed to know the fact, in the performance of his official duties, as to the amount of the deposit or the character of the deposit.    In the absence of any evidence, and assuming that the allegations of the bill are true, it may be presumed that thus far the facts stated by the cashier of the First National Bank in regard to the character of the deposit, whether it was capital stock, or capital stock and surplus, was such as the books of the bank showed, or such as the cashier of the bank and the custodian of the deposits had a right to know and might communicate.    So that if he knew the deposit was made up by discounts credited with the intention of swelling the deposit, with a view to deceiving the insurance commissioner into believing that the capital stock was paid up, it would be within the bank's corporate powers.    The liability in such a case would be because the false representations were made about a thing which was the bank's business in connection with its corporate powers, and in the usual course of the business of the cashier of the bank.    We think the case of Fisher v. Bank, 12 C. C. A. 413, 64 Fed. 674, sustains this view; nor do we think that this view is contrary to the doctrine announced in the case of Weckler v. Bank, 42 Md. 581; or that of Bank v. Pirie, 27 C. C. A. 171, 82 Fed. 799.    In the last case the court used quite strong language on the subject of guaranty, holding that the guaranty was beyond the powers of the national bank, in a case where a vendor endeavored to set aside a sale of goods made by him on the ground of fraud of the vendee.    It appeared that the vendee had presented, among other things, to the vendor, the guaranty of the national bank.    The court held that such a guaranty was beyond the powers of the national bank; that the national banking act conferred no authority to make such a guaranty by express terms or by fair implication; and further held that, in contemplation of law, the vendor knew when he sold the

goods in question that the guaranty was of no value, even though he supposed it had been executed with the sanction of the board of directors, and therefore he was not defrauded. But here we think no such view can be taken, as Mr. Duncan, the insurance commissioner, had the right to rely upon a statement made by the cashier of the First National Bank in regard to the deposits in the bank to the credit of the insurance company and upon what account. In passing, it is not, however, intended to say that, if part of this deposit was made up by discounting notes of stockholders, even though such notes were indorsed by the insurance company, such fact would be itself fraud upon the law, or that it would be a false statement in regard to the paid-up capital stock.

Assuming, therefore, that so far the representations of the cashier of the First National Bank were not ultra vires, and that these acts were so far in the course of the business of the First National Bank, and in the course of the employment of the cashier, and did, as alleged, induce, or tended to induce, the issuing of the license by the insurance commissioner, the next inquiry is, can the complainant, who purchased his stock when the insurance company was a going concern, and to whom no representations were made, and who knew nothing of the representations made to the insurance commissioner, recover the value of his stock upon the ground that false representations had been made to the commissioner, and that the commissioner was thereby induced to license the insurance company?

We think the general doctrine is very well stated by Mr. Cooley in his work on Torts (page 493). He says:

"No one has a right to accept and rely upon the representations of others but those to influence whose actions they were made. * * * When statements are made for the express purpose of influencing the action of another, it is to be assumed they are made deliberately and after due inquiry, and it is no hardship to hold the party making them to their truth. But he is morally accountable to no person whomsoever but the very person he seeks to influence, and whoever may overhear the statements, and go away and act upon them, can reasonably set no claim to having been defrauded if they prove false. Fraud implies a wrongful actor and one wrongfully acted upon; but in the case supposed there is no privity whatever. Therefore one may even be the person to whom the false representations are made, and yet be entitled to no remedy if they were made to him as agent for another, and to affect the action of the other, and were not intended to influence his own action. But some representations are made for the express purpose of influencing the mind of the public, and of inducing individuals of the public to act upon them; and whoever in fact does receive, rely, and act upon these in the manner intended has a right to regard them as made to him, and to treat them as frauds upon him, if in fact he was deceived to his damage. Cases of this sort are those in which the projectors of corporate undertakings publish prospectuses containing misrepresentations calculated to influence others to invest moneys in their project. The cases are numerous in which the courts— sometimes of equity and sometimes of law—have given relief to parties defrauded by such misrepresentations."

The learned author refers in a note, to sustain this view, to the case of Wells v. Cook, 16 Ohio St. 67. In that case an agent bought for his principal some diseased sheep under false representations made by the vendor that they were sound, and afterwards purchased them of his principal, and suffered damages in consequence

of the spread of the disease. The court held that he was not entitled to any redress against the first vendor. The case itself is exceedingly carefully considered. In that opinion of the supreme court of Ohio, delivered by Judge Brinkerhoff, after reviewing the cases, the court uses the following language:

"The influences of human conduct, good or bad, are far-reaching, and are often seen and felt in consequences exceedingly remote, but uncertain and complicated. It is simply impossible that municipal law should take cognizance of all these consequences. From necessity, a large share of them 'must be left to the jurisdiction of public opinion, individual conscience, and finally to the retributions of another world. There must somewhere be fixed a limit between the near and remote, direct and indirect, consequences, beyond which the law will not take cognizance of them. And in this case we are satisfied that one of the prescribed limits is this: that the false and fraudulent representations must have been intended to be acted on in a matter affecting himself by the party who seeks redress for consequential injuries."

This case was approved by Judge Leavitt, district judge of the Ohio district, and applied in the case of Ware v. Brown, 2 Bond, 268, Fed. Cas. No. 17,170. In that case there was a leasehold for oil purposes of a certain piece of land in West Virginia. Certain parties owned three-fifths of the leasehold, and one Cochran owned the other two-fifths. There was a conveyance made by the parties who owned only the three-fifths of the entire leasehold, and in the conveyance Cochran, the owner of the other two-fifths, was falsely united as a conveyer. This was certified by Brown, a notary public, i. e. that Cochran personally appeared before him, and acknowledged and signed and sealed the same in his presence. This conveyance was to one Buffington, who made several conveyances thereafter of the entire property, but the defect in the title was not found until after the several conveyances, and it caused the remote vendee a considerable sum of money to perfect his title. He sued the notary public, Brown, for false representations. The court held that Buffington could recover damages, but that the wrong committed was not assignable in fact or by operation of law, and that the plaintiff, Ware, could not recover. The case of Hunnewell v. Duxbury, 154 Mass. 286, 28 N. E. 267, seems to be in principle on all forms with the case at bar. In that case the Massachusetts law required that foreign corporations should have a certificate filed with the commissioners of corporations of the state of Massachusetts, in order to be allowed to do business in that state. Such a certificate was signed by the defendants, with a jurat which stated that the capital stock of the corporation, which was a Maine corporation, amounted to $150,000, and had been paid in, and that the electrical advertising devices, to the value of $149,-650, had been transferred to it. It was held that the defendants who made this statement were not liable for damages, for false representations, to a person who had taken the notes of the corporation, and who had been informed by his attorney, who had read it, of the statement in the certificate. The court say:

"The statement which was made to enable the corporation to do business was too remote from any design to influence the action of the plaintiff in taking the notes of the corporation to make it the foundation of an action of deceit. To sustain such an action, the misrepresentations must either have been made to

the plaintiff individually, or as one of the public, or as one of a class to whom they are in fact addressed, or have been intended to influence his conduct in the particular of which he complains."

We have not seen, nor has our attention been called, to any case which either controverts or overrules the principles announced in the above case.

In the great case of Peek v. Gurney, L. R. 6, H. L. 373, which was a case decided in 1873, all of the English cases that were pertinent to the question were reviewed and most elaborately considered by the then lord chancellor, Lord Cairns, and the other judges. In that case one Peek, the appellant, purchased a large number of shares in a corporation called the "Overland & Gurney Company." This company was formed in 1865, for the purpose of getting new money for use in the business of Overland & Gurney, an established company, who had been previously considered very prosperous. A prospectus was issued by certain parties, in which a statement was made in regard to the assets and business of the previous company and its profitableness. These statements were false statements and material. Peek, however, was not one of the original allottees, i. e. one of the parties who subscribed and paid for the stock which was originally issued by the company, but bought from a party who was an allottee of such stock. The company failed in a little while, and he lost all of his stock; besides, he had to pay a very large amount on his shares in the winding up. The inferior court dismissed the bill, on the ground that he waited too long. When the case came to the house of lords, they discussed the question on its merits, and refused to affirm upon that ground, but did affirm upon the ground that he had no right of action against the original signers of the prospectus, as he was not an original allottee; that the liability for the false statements was only to the original allottees of the stock. The grounds, as we understand, of this most elaborate consideration and decision of the nonliability of the defendants, signers of the prospectus, was that the purpose of issuing the prospectus was to obtain the original subscription. The original subscribers who were influenced by the prospectus were entitled to recover, but not those who acquired stock subsequently, although they may have known, as did the appellant in the case, of the statements, and had been influenced in the purchase of the stock by what was therein stated. While it was a general statement that all might read, it was with a definite purpose, and the liability for the wrong done was only to those who were influenced to subscribe originally under the invitation of the prospectus. This we conceive to be the principle which is announced by Mr. Cooley in general terms, and also by the supreme court of Ohio in Wells v. Cook. It may be that there are some cases in the United States which may hold those who signed a general prospectus, and issued it to the public, for the organization of a corporation, or the promotion of enterprises, to be liable for whomever may be injured by the false representations. In such cases, it must be that they are put upon the ground that it is intended to deceive any one to whom the knowledge may come, and who may act upon the repre-

sentations, and for an indefinite time. But, if the principle upon which those cases are decided be conceded to be sound, it should have no application to the case at bar, since the misrepresentations which are alleged to have been made by the bank's officers, within the scope of its corporate authority, were only made to Duncan, the insurance commissioner, and only influenced him, and were only intended to influence him, if we assume, as we must, that all the allegations of the petition are true. We conclude, therefore, that on this ground the defendants' demurrer should be sustained; and it is so ordered.