## TEXAS & N. O. R. CO. v. WEBSTER.
### No. 2715.

Court of Civil Appeals of Texas. El Paso.
Oct. 13, 1932.

Rehearing Denied Nov. 3, 1932.

Baker, Botts, Andrews & Wharton, of Houston, and Kemp & Nagle, of El Paso, for appellant.

Lea, McGrady & Edwards, of El Paso, for appellee.

WALTHALL, J.

We adopt the statement of the nature and result of the suit, as submitted by appellant in its brief, with the additional suggestion of appellee that, when the deceased and the other members of the switching crew were serving the defendant, they were, with defendant, engaged in interstate commerce:

"This suit was brought by Katie M. Webster, in her individual right and as temporary administratrix and legal representative of the estate of G. C. Webster, deceased, and as next friend for Doris Webster and Marguerite Webster, minors, against the Texas & New Orleans Railroad Company, in the Forty-First district court of El Paso county, Tex., which was tried upon plaintiff's first amended original petition, wherein she alleged that in about the months of August, September and October of 1930, and for a long time prior thereto, G. C. Webster, now deceased, was an employee of the defendant, serving it in and near El Paso, Tex., as foreman of a switching crew; that defendant operated a railroad for transportation of freight and passengers, in cars propelled by steam engines, hauling and

transporting large quantities of cars containing fruits, vegetables, and other perishable foodstuffs which required icing at regular intervals; that the proper refrigeration of such cars required defendant to have available at all times large quantities of ice ready to be shifted into the bunkers of such refrigerator cars, and at the time complained of, and prior thereto, defendant maintained and operated, and caused to be maintained and operated, a long icing platform situated along its switching tracks, adjacent to an industry known as Globe Mills, near the city of El Paso; that such icing platform was about three-fourths of a mile long and built at a height about the top of the refrigerator cars standing on defendant's tracks alongside to be iced; that, in order to provide means for shifting the ice from the platform to the tops of the refrigerator cars, defendant caused to be provided along the entire length of the outside edge of both sides of said platform certain wooden aprons, each of which was in itself a unit built of heavy structural timbers, approximately 12 feet in length, 2 inches in thickness, and 2 feet or more in width, weighing approximately 150 pounds, which apron was held together by metal bands, and was hinged to such platform by means of heavy metal hinges, so that, when not used, said apron was fastened in an upright position at right angles onto the floor of the platform, but, when in use for the purpose of shifting ice from the platform to the car top, the apron was lowered and held in a horizonal position, level with the floor of the platform, but extending outwardly to the edge thereof, the said apron being so arranged that it lowered from hinges on the bottom, and, when it reached a horizontal position was held by a chain at each end attached to the side of the icing platform.

"That on the occasion in question said G. C. Webster, in company with other employees of the defendant, carried one or more refrigerator cars which required icing from a point in the yards near the city of El Paso to said icing track. That, prior to reaching the point at which said refrigerator car or cars and the engine propelling same had been stopped, the said Webster descended from said cars, or engine, upon which he was riding, for the purpose of opening the necessary switches to allow the engine and cars to enter the proper track. That one of the said crew, being defendant's brakeman or switchman, rode the top of the refrigerator cars, it being a part of his duties to give signals to the engineer, advising him when the car had reached the proper point. That the said Webster walked from the point at which he had descended from said car, cars or engine, to throw the switch to the point at which said cars had been stopped under the signal from defendant's employee on the top of such cars, and, as the icing operation had not begun

by the time the said Webster reached the refrigerator cars, he started up the ladder on the side of one of the cars, being the easterly side thereof, said Webster being between the side of the refrigerator car and the icing platform, that is, he was ascending the ladder on the side of said car, and, at the time when the top of his head had extended somewhat beyond the level of the top of said refrigerator car, defendant's employee, in the performance of its business and within the scope of his employment, without warning to the said Webster, released the fastenings on one of the above-described aprons and pulled the same over and outward toward the top of said car, allowing the same to fall with great force upon Webster's head, somewhat to the right of the center thereof, with such force as to knock the said Webster's feet loose from the iron ladder on the side of said car and produced injuries of a painful and fatal nature. That such blow produced a large, severe, and painful swelling which soon subsided, and the said Webster experienced no further effects from said blow, so far as known to plaintiff, until about ten days or more after the said blow on the head, when peculiar sensations in his left side were felt, experienced, and spoken of by the said Webster, who nevertheless continued in the employment and service of defendant until such time as he lost the use of his left side, and his condition grew worse until he died about April 28, 1931, eight months following the injuries sustained. That the blow on his head produced a severe jar, concussion, and injury to the right side of his brain so that some of the cells thereof disintegrated, softened, and died; the use of the left side of the said Webster's body being progressively lessened.

"Negligence is alleged on the part of the brakeman in question, in lowering the apron as aforesaid, for which defendant is sought to be held liable for the death of the said G. C. Webster.

"Plaintiff further alleged that she was the lawful wife of the deceased, and there were born of the marriage two children, to wit, Doris Webster, a girl seventeen years of age, and Margueritte Webster, a girl fifteen years of age; that plaintiff was the temporary administratrix and personal representative of deceased, and that this suit was brought for the benefit of plaintiff, Katie M. Webster, and the two children, as well as for the benefit of Mrs. Frances Spurlock, a daughter of deceased by a former marriage, she herself being now a married woman; that the above-named children are plaintiff's sole heirs; that said deceased suffered conscious pain prior to his death; and plaintiff sued for $40,000 for actual pecuniary loss sustained by them, through the untimely death of the said G. C. Webster, and for $10,000 for time lost during the incapacity of deceased prior to his death,

and for mental and physical pain and anguish suffered by him, which was alleged to be to the damage of deceased and his estate.

"Defendant answered by general demurrer, general denial, and further answered that, as a condition precedent to employment in the railroad service, this defendant and the railroads of the country generally required application for employment to be written and filed by each applicant, and in this case deceased, G. C. Webster, did, on the 26th day of July, 1916, make out and sign his application in writing, duly acknowledged the same, and delivered same to the Galveston, Harrisburg & San Antonio Railway Company, this defendant's lessor and predecessor in title, for employment as switchman. That amongst other questions contained in said application blank so executed by said Webster was the following: 'Q. Have you ever employed or been represented by an attorney in connection with any claim or suit for damages against a railroad or street car company or other employer? If so, state fully all facts pertaining to such claim or suit, and give the name and address of the attorney and the disposition made of the claim or suit?' to which the said G. C. Webster answered in writing, as follows: 'No.'

"That the said question called for information which was material and important in connection with the employment of the said G. C. Webster, and a material question to be considered in the railroad company's determination of whether or not it would employ the said applicant. That the said answer of the said Webster was false and untrue, and was known by the said Webster to be such. That in truth and in fact the said Webster had, prior to the date of such application, been an employee of the Missouri, Kansas & Texas Railway Company of Texas, and claimed to have suffered an accident, and to have sustained serious and permanent injuries while in such employ and while working for said Missouri, Kansas & Texas Railway Company, in Belle Mead yards, on or about June 3, 1915. That the said Webster thereafter, and on or about September 2, 1915, had filed suit for damages against said railway company on account of such injuries, in the district court of McLennon county, Tex., Seventy-Fourth judicial district, and the said G. C. Webster had employed the law firm of Messrs. Shurtleff & Cummings, a copartnership composed of E. L. Shurtleff and B. Y. Cummings, to file said suit, and they had filed the same, for $20,000, claiming serious and permanent injuries, and representing the said Webster in the prosecution and settlement thereof, and had compromised and settled the same for a large amount of money. That the said answer of the said G. C. Webster was false and untrue, and constituted a fraud on the Galveston, Harrisburg & San Antonio Railway Company and this defendant, and in

truth and in fact the said Webster, in consequence thereof, never became an employee of the Galveston, Harrisburg & San Antonio Railway Company, or of this defendant. That, when this defendant took over the operation of the Galveston, Harrisburg & San Antonio Railway Company, it took over all applications for employment, and continued the employees in its service, on the strength of such applications, and thereby in all things took the place and stead of the said Galveston, Harrisburg & San Antonio Railway Company, in connection with such employment and in the reciprocal rights and duties owing to each.

"That, at the time plaintiff claimed that the said G. C. Webster sustained his accident, the car which plaintiff alleged deceased was ascending was being transported in interstate commerce, and was loaded with produce being transported in interstate commerce, and the re-icing thereof was due in connection with such interstate commerce, and the rules and decisions of the United States Supreme Court are applicable in connection therewith, and the rights and duties of the said Webster were subject to and controlled by the laws of the United States, and the Federal Employers' Liability Act (45 USCA §§ 51–59).

"Defendant further answered that, if deceased was in fact and in law an employee of the defendant, then defendant and deceased were both, at the time, engaged in interstate commerce and in furtherance thereof, and injuries of the said deceased, if any, were due to risks and dangers incident to his employment, and risks and dangers which he knew of, or must necessarily have known of, and were risks and dangers assumed by him, for which defendant is not liable.

"The case was tried before a jury during the month of December, 1931, and the court submitted the case to the jury on special issues; he having first refused defendant's request for peremptory instruction. The court also refused certain special issues asked by the defendant after the court had refused its request for peremptory instruction. The jury, in response to the issues submitted to them by the court, found that the deceased, G. C. Webster, suffered injuries to his head by being struck by an apron lowered to connect the top of the refrigerator car with the platform; that the employee lowering same was acting at the time in the business of defendant and within the scope of his employment; that the said employee, lowering the apron, omitted to keep a lookout; that he was negligent in so doing, and that the same was the proximate cause of the death of the said G. C. Webster; that he lowered such apron with unnecessary violence; that same was negligence, and was the proximate cause of the death of the said G. C. Webster, but that the same was not due to risks and dan-

gers assumed by the deceased, G. C. Webster; that the surviving wife of the deceased and the two daughters, Doris and Margueritte, suffered pecuniary damages as the result of the death of the said G. C. Webster, which damages amounted to $27,000, $2,000 of which was for conscious pain and suffering and loss of time prior to the death of the said Webster. Of this amount, $16,000 was apportioned to Katie M. Webster, and $5,500 to each of the minor daughters.

"On these findings of the jury, the court, on December 14, 1931, entered judgment for Katie M. Webster, as administratrix of the estate of G. C. Webster, deceased, against the Texas & New Orleans Railroad Company for the sum of $27,000, and 6 per cent. interest thereon from date, apportioning the same as found by the jury."

From the judgment entered, the defendant railroad company duly prosecutes this appeal.

### Opinion.

Appellant presents thirty assignments of error, each of which is submitted separately as a proposition, and in addition thereto additional propositions are urged.

Appellant summarizes the assignments and additional propositions and discusses them under five points, and we will consider them as so arranged.

First. It is urged that the trial court erred in not peremptorily instructing a verdict for appellant because (a) the uncontroverted evidence showed that G. C. Webster, the deceased, had obtained his employment with the Galveston, Harrisburg & San Antonio Railway Company, of which appellant was its successor, by false and untrue representations material to his employment, as more fully stated above, by reason of which appellant submits that Webster never became an employee of either of said railroad companies, the rights of appellee herein to recover being governed by the laws of the United States and the Federal Employers' Liability Act; (b) the uncontroverted evidence showed that the switchman, Campbell, who lowered the gate or apron in question, in so doing was not acting within the scope of his employment, or in furtherance of the business of his master, appellant; (c) the uncontroverted evidence showed that the deceased, C. G. Webster, knowing and appreciating the dangers in so doing, and while engaged in interstate commerce, chose an unsafe way to get to the top of the car by climbing up immediately beneath where the apron was to be lowered, and that, when he did so, he being an experienced switchman, knowing and appreciating the dangers incident thereto, when a safe and convenient way was offered, that is, by climbing to the top of the car at some other place than immediately under the apron in ques-

tion, he assumed the risk of doing the work in an unsafe way.

On the first contention claiming error in not peremptorily instructing a verdict for appellant as indicated under (a) and (b), based on the question to Webster by the Galveston, Harrisburg & San Antonio Railway Company, and his answer thereto as to whether he had ever been employed or been represented by an attorney in connection with any claim or suit, and, as more fully stated above, the evidence shows that in Webster's application for employment with the Galveston, Harrisburg & San Antonio Railway Company in 1916 the question was asked him and the answer thereto given as in the above statement, to the effect that he had never been employed or been represented by an attorney in connection with any claim or suit for damages against a railroad or street car company or other employer, and, if so, to state fully all the facts pertaining thereto, and give the name and address of the attorney, etc. To the question Webster answered, "No." Without stating the evidence at length, it shows that, previous to said question and answer, Webster had sustained an accident while working for the Missouri, Kansas, & Texas Railway Company, a railroad company; that he had employed attorneys to represent him; that his attorneys had filed suit in his behalf against the employer railroad company for his claimed injuries, and that the suit had been settled for a sum paid. The evidence of L. B. McDonald, general manager of the Southern Pacific Lines in Texas, shows that, had the question to Webster, as above, been truthfully answered, the Galveston, Harrisburg & San Antonio Railway Company would not have employed Webster. The evidence shows that the operation of the Galveston, Harrisburg & San Antonio Railway Company, under authority of the Interstate Commerce Commission, was taken over by appellant, and that, in taking over the operation, appellant took over the employee's records, applications, contracts, and various matters of that sort which the Galveston, Harrisburg & San Antonio Railway Company had.

■ Waiving the question as to whether Webster was an employee of appellant at the time of his injury, the suit being brought under the Federal Employers' Liability Act, and Webster at the time, whether rightfully or wrongfully, was in fact acting as a switchman for appellant then engaged in interstate commerce, the decisions of the federal courts will control upon the questions involved where there is a conflict between the federal courts and the state courts. Fort Worth & D. C. R. Co. v. Griffith (Tex. Civ. App.) 27 S.W.(2d) 351, and cases cited.

■ It is a well-established rule of decision by the Supreme Court of the United

States, and uniformly followed by our Texas Courts, that in proceedings brought under the Federal Employers' Liability Act rights and obligations depend upon the construction the Supreme Court places upon said act. New Orleans & N. E. Railway Co. v. Harris, 247 U. S. 367, 38 S. Ct. 535, 62 L. Ed. 1167; Minneapolis, St. P. & S. S. M. Railway Company v. Rock, 279 U. S. 410, 49 S. Ct. 363, 73 L. Ed. 766; Philadelphia, B. & W. R. Co. v. Schubert, 224 U. S. 603, 32 S. Ct. 589, 56 L. Ed. 911; Watson v. St. Louis, I. M. & S. R. Co. (C. C.) 169 F. 942.

█ The question is then presented: Was the court in error in not peremptorily instructing a verdict for appellant as duly submitted and requested by appellant, for the reason that at the time of his injury Webster was not an employee of appellant, by reason of the said question and answer submitted to him by the Galveston, Harrisburg & San Antonio Railway Company.

Webster's answer to the question was not as explicit as might have been, but we think by the answer Webster conveyed the idea that he was never connected with any claim or suit for damages as expressed in the question. It is true, as suggested by appellee, that in his application for employment Webster stated that he had been injured, which occurred at Waco, Tex., by the brake wheel; that the injury was a bruised back. But, as we view it, the point of the inquiry was not so much as to a previous injury but the prosecution of a claim for such injury, and which he denied. So considered in making the answer, we think the evidence shows a deception and an adequate cause for a rejection of his application for his employment had the Galveston, Harrisburg & San Antonio Railway Company, propounding the question, known the facts disclosed by the record.

Appellee, however, contended in the trial court, and makes the contention here, that appellant is in no position to take advantage of any statement made by Webster in the application for employment offered in evidence, conceding for the purpose of the question that Webster's answer was an untrue and willfully false statement to the facts inquired about. The contention is to the effect that, the statement not having been made to the appellant, but to the Galveston, Harrisburg & San Antonio Railway Company, appellant had, and now has, no legal right to rely on such statement, and that, if appellant did rely upon it, it did so at its own risk.

The record shows that Webster was examined on his application for employment with the Galveston, Harrisburg & San Antonio Railway Company on July 26, 1916; that he was employed by the Galveston, Harrisburg & San Antonio Railway Company and worked as switchman for that company until taken over by appellant on March 1, 1927, and then worked for appellant as switchman until he was injured, in September, 1930, as complained of in this suit, and then for some time thereafter; that the Galveston, Harrisburg & San Antonio Railway Company and appellant, Texas & New Orleans Railroad Company, are separate and distinct corporations. The latter corporation took over the operation, employees, the records, applications, contracts, and various things of that kind, of the former corporation; it was the practice of the said railroad companies to make investigation of the past record of new employees as promptly as possible. The record does not show whether the past record of Webster was investigated by either company, or whether either company relied on the statement made by Webster in his application as being true. We think from the evidence it might be presumed that such investigation was made, and that the Galveston, Harrisburg & San Antonio Railway Company relied on the statement as being true. Witness McDonald said that, had Webster answered affirmatively that he had such suit, giving the names and addresses of his attorneys, and stating fully the facts of such claim or suit, and the disposition made of the claim or suit, the Galveston, Harrisburg & San Antonio Railway Company would not have employed Webster. The reason given was: "We (the companies) have a certain code of ethics in our operations applicable, which requires that they be men of good moral character, not troublesome, not inclined to be litigating over matters of minor importance, and that they should properly adhere to the policy of proper relations between the employing company and the employee. This requirement takes into consideration the safety of the other employees and the public generally, insofar as they require men to be in good physical condition; that is the very foundation, in fact, the very fabric."

The record shows that, at the time of Webster's employment by the Galveston, Harrisburg & San Antonio Railway Company, he turned over to that company his service letter from the Missouri, Kansas & Texas Railway Company, against which he had his claim and filed his suit, showing his employment by that company for more than a year next preceding his employment by the Galveston, Harrisburg & San Antonio Railway Company. From all of the facts and circumstances shown, appellee submits that the facts indicate that after investigation was made the Galveston, Harrisburg & San Antonio Railway Company with full knowledge of all the facts surrounding Webster's previous injury, and his subsequent continuous service with the Galveston, Harrisburg & San Antonio Railway Company and appellant, for some fifteen years, said companies had elected to keep Webster as an employee, and that by

reason thereof it should not now be held as a matter of law that appellant is under no liability for its negligence, as found by the jury.

We have concluded that, while Webster's position as as employee of appellant is essential to the right of appellee to recover under the Federal Employers' Liability Act, this court would not be justified under the record in holding that he was not of right an employee within the meaning of the act. The evidence, in our opinion, is not of that degree of certainty that we can say that Webster obtained and held his place with the two companies through all the years through fraudulent means. Should we be in error in so holding, the evidence shows that the misrepresentations made by Webster in obtaining his employment were made to the Galveston, Harrisburg & San Antonio Railway Company, and not to appellant. Appellant took Webster over as an employee in taking over the Galveston, Harrisburg & San Antonio Railway Company. The evidence shows that appellant took over Webster as an employee by permission of the Interstate Commerce Commission, and the Texas Railroad Commission, and investigated Webster's standing as an employee after taking him as such. Was Webster of right an employee of appellant, or did his misrepresentation to his former employer destroy that right within the meaning of the act? True, it may be said that, if Webster was never an employee of the Galveston, Harrisburg & San Antonio Railway Company, he was not of right an employee, though taken over as such by appellant; that, not having disclosed the facts embodied in the question to him on his application, his status was at all times wrongful and at all times continuous and destroyed his right to be an employee.

We have found no case directly in point.

█ It seems to be settled law that, if a false statement be made to one person to induce him to act, the balance of the world has no legal right to rely on it, and especially would that seem to be the rule where the world does not rely on it and assumes to itself to investigate for itself and does investigate, and for years acts upon the result of its investigation. The above seems to be the rule of decision. McCracken v. West, 17 Ohio, 16; Wells v. Cook, 16 Ohio St. 67, 88 Am. Dec. 436; McKee v. Rudd, 222 Mo. 344, 121 S. W. 312, par. 1, 133 Am. St. Rep. 529; Hunnewell v. Duxbury, 154 Mass. 286, 28 N. E. 267, 13 L. R. A. 733; Hindman v. First Nat. Bank (C. C.) 86 F. 1013; McCane v. Wokoun, 189 Iowa, 1010, 179 N. W. 332, par. 3; Webb v. Rockefeller, 195 Mo. 57, 93 S. W. 772, 6 L. R. A. (N. S.) 872.

It is not claimed that appellant was in any manner deceived or misled by said misrepresentations in employing or retaining Webster in its employ.

█ Appellant requested and the court refused to give in charge to the jury its special issue No. 3, to the effect, in substance, whether the jury found that the answer of Webster in his application for employment made to the Galveston, Harrisburg & San Antonio Railway Company, to the effect that he had not employed attorneys in any suit, etc., as in the question stated above, in his application for employment; and applicant requested and the court refused to give special issue No. 3-A, in the event the jury should answer No. 3 in the affirmative, issue 3-A being, in substance, did the jury find that, if Webster had truthfully given the information requested as to whether or not he had a former suit against any railroad, etc., as in the question stated on his application for employment, whether the railroad company (Galveston, Harrisburg & San Antonio Railway Company) would have employed him. We see no error in such refusals.

The issues submitted were not made issues in the answer, they were evidentiary only, the statements were not made to appellant, and whatever statements were made were not controverted in the evidence and were not issues for the jury.

█ The court refused to give appellant's requested charge 3-B, to wit: "Do you find from the evidence that the T. & N. O. Railroad Company took over the contracts, applications and operation of the G. H. & S. A. Railway Company, and operated the same under the same conditions as it was being operated by the G. H. & S. A. Railway Company?"

We see no reason why such issue should have been submitted to the jury. There was no controversy in the evidence that such was not done. The evidence shows that such was done, and there was no issue to submit to the jury. Had appellant so desired for any purpose, the court could properly have instructed the jury that the Texas & New Orleans Railway Company took over the contracts, applications, and operation of the Galveston, Harrisburg & San Antonio Railway Company and operated the same, as in the question stated.

█ Appellant assigned error to the court's refusal to give its requested peremptory instruction, for the reason, as submitted, that the uncontroverted evidence shows that switchman Campbell, in lowering the apron, was not acting within the scope of his employment as an employee of appellant railroad company.

The evidence shows that switchman Campbell was a member of the switching crew in the employ of appellant of which the de-

ceased, Webster, was, during his lifetime, and on the occasion in question, foreman switchman. At the time and place of the accident, Campbell was acting as long field man; his duty on the occasion included that of throwing the switches and ride the tops of the cars to destination for the purpose of spotting the cars by the icing platform, and on the occasion in question the cars were being spotted by the train crew for the purpose of being iced. The evidence shows that proper refrigeration of larger quantities of cars containing fruits, vegetables, and other perishable foodstuffs required icing at intervals, and for that purpose appellant had at all times ice ready to be shifted into the bunkers of its refrigerator cars, and at the time involved here appellant maintained and operated a long icing platform situated along its switching tracks adjacent to an industry known as Globe Mills; that such icing platform was about three-fourths of a mile long and built at a height about the top of the refrigerator cars standing on appellant's tracks alongside to be iced; that, as a means for shifting the ice from the platform to the tops of the refrigerator cars, appellant caused to be provided along the entire length of the outside edges of said platform certain wooden aprons, each within itself a unit, and built of heavy structural timbers, approximately 12 feet in length, 2 inches thick, and some 2 feet wide, weighing some 150 pounds, which apron was hinged to such platform by means of hinges, so that, when not used said apron was fastened in an upright position at right angles to the floor of the platform, and when in use for the purpose of shifting ice from the platform to the car top, the apron was lowered and held in a horizontal position level with the floor of the platform, and extending outwardly from the edge thereof some 2 feet or more and slightly higher than the tops of the cars and far enough out from the platform to enable blocks of ice to be skidded from the platform across the apron to the tops of the cars.

We copy here from the statements of some of the witnesses, presented in question and answer form.

The switching crew in charge of the train at the time the matters in controversy occurred were: Schwartz, engineer; D. L. P. Duke, fireman; G. C. Webster, deceased, foreman of the switching crew; G. McSorley, Wesley Black, and Mr. Campbell were switchmen and members of the crew.

D. L. P. Duke testified:

"Question: Just prior to the time you ran in on this icing track, was it necessary to throw a switch to let those cars go in there or not?" (pushing the train from the main track to the side tracks on either side of the icing platform at Globe Mills). Answer: It was necessary to throw two switches, one to get off the main line on to the lead and two tracks come together just south of the platform; one leads on the west and one on the east side of the platform, and we headed in on the track on the west side of the platform and it was necessary to throw that switch."

"Question: Who threw the first switch, if you know? Answer: I think Campbell, the long field man threw both of them * * * that was his job.

"Question: Who was on top of the car to signal you to stop by the icing platform, where to stop? Answer: Well, he (supposedly Campbell) had gotten back on top. There were two men on top of the cars going out there.

"Question: Now Webster got off. Where was Webster riding going out? Answer: He rode the engine.

"Question: When you first got out there and took the lead off the main line, where did Webster get off? Answer: As well as I remember Webster rode with us until we had spotted the cars and stopped. * * *

"Question: At that time you say Mr. Campbell was on top of the cars. Answer: Campbell and McSorley were both up there until they threw the switch. McSorley stayed at the last switch and line up behind us.

"Question: Then when you ran in and stopped by the pile of ice, McSorley was at the last switch, and Webster was on the engine and Campbell was on top of the car giving the signal where to stop? Answer: I think Campbell was on the car; I couldn't say because I could not see him.

"Question: They were signaling to Schwartz, the engineer? Answer: They were signaling on his side, yes, sir.

"Question: But Campbell was not on the engine with you? Answer: No.

"Question: And you are sure he was on top of those cars somewhere? Answer: Yes. * * *

"Question: Now, how long had the cars been spotted there do you think before the accident occurred to Mr. Webster? Answer: Well, I suppose it was about a minute or two minutes possibly before the engineer called to me and told me Webster was hurt."

Witness jumped off the engine and ran to where Webster was. When witness reached the place, Webster was up about the top of the car hanging on the side of the car. Switchman Campbell was on top of the car holding Webster by the arm. Switchman Black was behind Webster pushing up against, holding him, pressing him against the car. Witness climbed up the end ladder and told Campbell that he would hold Webster until Campbell could climb down when Webster said he was all right and could get down, which he did.

Witness further testified:

"Question: It is no part of the duties of the railroad company employees to put these aprons down, that is the duties of the employees of the Globe Mills, isn't it? Answer: That is my understanding.

"Question: The Globe Mills are the people who sell the ice and deliver it, that is correct, isn't it? Answer: Yes.

"Question: And this apron is put down by their men as they drag the ice across the platform? Answer: Yes, sir.

"Question: The employees of the Globe Mills, as a matter of fact, fill the bunkers? Answer: Oh, yes.

"Question: And the bunkers are filled from the top of the car? Answer: All we do is spot the car.

"Question: It is none of your business to load it? Answer: Oh, no.

"Question: Now, as a matter of fact, the company employees, the switchmen and brakemen, on top of these cars customarily let these aprons down themselves when they go in there to spot a car, wouldn't they? Answer: I would not say it was customary, may be sometimes they do, and sometimes they do not.

"Question: It was a matter frequently done by them, wasn't it? Answer: I would not say it was, but I have seen it done."

G. McSorley testified:

"Question: Mr. McSorley, the switchmen or brakemen on top of those cars when they run in there, when cars are spotted by the piles of ice customarily help out the icing man by letting those aprons down on many occasions, don't they? Answer: Well, the idea of dropping those, which we all do and have done, is when we shove into the ice house, one of us is possibly on top of the car and we will drop the apron so we can climb over on the platform so we are out of the way of the icing platform man.

"Question: But those aprons are customarily dropped by the brakeman or switchman? Answer: Yes, sir.

"Question: That has always been the custom since you have had this platform? Answer: Lots of times we do that so we can get over on the platform."

Charles M. Griggs, employee of the Pacific Fruit Express, testified that it was the duty of the Pacific Fruit Express to put the apron down, and not the duty of the railroad crew.

The uncontradicted evidence shows that switchman Campbell let down one of the aprons, striking Webster on the head while Webster was attempting to climb on top of the car. Appellant submits that the uncontroverted evidence is to the effect that it was no part of the duty of switchman Campbell to lower the apron, and that in so doing he was not acting in furtherance of the master's business, or within the scope of his employment.

The jury found, under the court's charge, that the apron was lowered by an employee of appellant "acting at the time in the business of the defendant."

On a special charge submitted by appellant, the jury found that "switchman Campbell in lowering the apron in question was acting within the scope of his duties as a switchman in the employ" of appellant.

The facts entering into the question presented might be summarized briefly as follows: Appellant was a common carrier, and, at the time of the accident to Webster, appellant and its employees handling its train of cars to be iced were engaged in interstate commerce. It was primarily appellant's duty to ice the cars it had then spotted to be iced, and to perform that duty it had prepared the necessary facilities, such as the platform on which the ice was to be carried from the Globe Mills to the several places for delivery, the aprons over which the ice was to pass from the platform into the several cars; had spotted the several cars on its track along the platform to receive the ice, and through the Globe Mills, as possibly an independent agency, had provided the ice that was to be put into the bunkers of the several cars; in fact, every step taken on the occasion in question, as well as every facility used, was in effect for the primary purpose of enabling appellant to ice the cars it had spotted to ice. It was necessary to let down the apron as a thing to be done to ice the cars. To do so was not an act foreign to the purpose of icing the cars; in a general sense, it was an act in furtherance of the master's business then being done in icing the cars. The difficult question presented is whether in letting down the apron switchman Campbell was acting within the scope of his employment as switchman. The evidence is that the brakeman or switchmen customarily dropped the aprons so that they could get from the cars over on the platform and out of the way of the icing platform man, and back to the cars. As said by Judge Buck of the Fort Worth Court in Hill v. Staats (Tex. Civ. App.) 189 S. W. 85, 86: "There is considerable contrariety of holding upon the question of what constitutes the 'scope of the servant's employment.'" Judge Buck, on a motion for rehearing, quoted with approval what is said in the recent work of "Berry on Law of Automobiles," in which quotation it is said: "The phrase 'in the course, or scope, of his employment, or authority,' when used relative to the acts of a servant, means while engaged in the service of his master, or while about his master's business. * * * It must appear that the acts complained of were done by him while performing the duties pertaining to that employment. * * * The test is whether the act done was in the prose-

cution of the business in which the servant was employed to assist. He may be acting within the scope of his employment, although disobeying the express commands of the master at the time. The question of the ignorance or consent of the master has no bearing upon his liability."

As said by the Supreme Court in International & G. N. Ry. Co. v. Anderson, 82 Tex. 516, 17 S. W. 1039, 1040, 27 Am. St. Rep. 902: "To hold the master liable for the act of his servant, it is not necessary that the servant should have authority to do the particular act. * * * But the act must be done within the scope of the general authority of the servant. It must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed."

While the question presented is difficult to determine, we are not prepared to say that the record presents reversible error.

Without further quoting, the following authorities seem to be in point and support appellee's contention: Gulf Refining Co. v. Texarkana & Ft. S. R. Co. (Tex. Civ. App.) 261 S. W. 169; American Produce Co. v. Gonzales (Tex. Civ. App.) 294 S. W. 273; Missouri, K. & T. R. Co. v. Edwards (Tex. Civ. App.) 67 S. W. 891; Ingram's Administratrix v. Rutland R. Co., 89 Vt. 278, 95 A. 544, Ann. Cas. 1918A, 1191, and note; New York Cent. R. Co. v. Marcone, 281 U. S. 345, 50 S. Ct. 294, 74 L. Ed. 892; Homan v. Borman (Tex. Civ. App.) 19 S.W.(2d) 438; Pierce-Fordice Oil Ass'n v. Brading (Tex. Civ. App.) 212 S. W. 707

The court refused to give appellant's requested issues Nos. 4, 4-a and 4-b, presenting the ultimate issue of assumed risk by the selection on the part of Webster of an unsafe way to climb on top of the car when a safe and convenient one could have been selected.

The jury found that the injury to Webster was caused by the negligence of switchman Campbell in lowering the apron, and that such negligence was the proximate cause of the death of Webster. The following authorities we think sustain appellee's contention that Webster's method of reaching the top of the car by climbing thereto at the time and place he did would not have been unsafe except for the negligence of switchman Campbell in letting down the apron, and that under such circumstances the theory of choice of methods of performing the work is not applicable, and assumed risk is not applicable: Galveston, H. & S. A. R. Co. v. Andrews (Tex. Civ. App.) 291 S. W. 590; Texas & N. O. R. Co. v. Bell (Tex. Civ. App.) 28 S.W.(2d) 853; Chicago, R. I. & P. R. Co. v. Ward, 252 U. S. 18, 40 S. Ct. 275, 64 L. Ed. 430; Chesapeake & O. R. Co. v. Proffitt, 241 U. S. 462, 36 S. Ct. 620, 60 L. Ed. 1102; Texas & P. R. Co. v. Aaron (Tex. Civ. App.) 19 S.W.(2d) 930 (writ refused, certiorari

denied, 281 U. S. 756, 50 S. Ct. 409, 74 L. Ed. 1166); Erie R. Co. v. Purucker, 244 U. S. 320, 37 S. Ct. 629, 61 L. Ed. 1166.

We might state also that the trial court in the main charge submitted to the jury the issue as to whether the injury to Webster was due to a risk or danger assumed by him as an employee of appellant, to which the jury answered, "No." Appellant submits that the case of Southern Pacific Co. v. De la Cruz (Tex. Com. App.) 228 S. W. 108, is applicable and controlling under the facts of this case. In that case, as we view it, there was no question or issue of negligence on the part of the railroad company or its employees, as here, which in itself made the one way of doing the work hazardous. We see no conflict between the De la Cruz Case and the cases above cited.

Katie M. Webster, suing in her individual right and as temporary administratrix and legal representative of the estate of G. O. Webster, deceased, and as next friend of Doris and Margueritte Webster, minors, was permitted to testify, in substance, over objection, that on the evening in question her deceased husband (Webster) told her that he "like to have gotten killed," and showed a lump on his head; he did not regard it as anything serious, nor did witness; witness began to notice that the fingers of his left hand began to tingle and he had a numbness in his arm; he complained all the time; he grew worse all the time, had no grip in his hand; his arm would swing just from the shoulder; you could see it in his walking, it progressed further in the left limb; at times when he would get up and start to walk he would fall; and other observations of witness as to his condition.

Doris and Margueritte Webster each were permitted to testify, over objection, that immediately after their father came in on the afternoon of the accident "he told us about this accident he had and showed us the bump on his head and kept complaining about a headache," and stated some symptoms they noticed as to his condition. They also stated that their father had discussed plans as to their schooling and in business course—that they were to have a good education.

Appellant submits that all of such testimony was inadmissible under article 3716 of our Civil Statutes; that such testimony was "as to transactions with or statements by deceased."

The evidence shows that the deceased made the remark to witness that he "liked to have gotten killed," and showed the lump on his head, but the greater part of the matter embraced in the bill of exceptions were observations made by the witness of her husband's condition separate and apart from his stated remark. The remark that he "liked to have gotten killed," and that the deceased "did

not regard it as serious," if deceased so remarked, we think were objectionable as being a statement by the deceased, but what the witness observed as to the lump on the head, and what witness observed as symptoms appearing reflecting his condition, such as "the fingers of his left hand began to tingle, and he had a kind of numbness in his arm," and that "that condition grew worse," and that "he did not have any grip in his hand," "that he would fall," and other statements as to his condition observed by the witness apart from any statement of the deceased, we do not think were objectionable as being "transactions" or "statements." We may not extend the language of the statute beyond its plain words. Cook v. Baker (Tex. Com. App.) 45 S.W.(2d) 161; Clemens v. Perry (Tex. Civ. App.) 29 S.W.(2d) 529; King v. King's Unknown Heirs (Tex. Com. App.) 34 S. W. 804.

To have the bill of exceptions considered as presenting reversible error, the rule seems to be that, "if the exception goes to the whole of the testimony complained of, and a part is admissible, the objection * * * will not be considered." Wells v. Hobbs, 57 Tex. Civ. App. 375, 122 S. W. 451, 453; Lanham v. Lanham, 62 Tex. Civ. App. 431, 146 S. W. 635. But, should we be mistaken in that, is article 3716 applicable here where Mrs. Webster recovered as in the judgment, only in the capacity as administratrix of the estate of Grover C. Webster, deceased, and the recovery being for damages sustained for injuries received while employed by appellant in interstate commerce? We think the record shows no reversible error by reason of her testimony. The testimony of Doris and Margueritte was withdrawn, and the court instructed the jury that same was withdrawn and not to consider same.

■ Appellant insists that the findings of the jury and the judgment of the court based thereon are unsupported by the evidence, and that the preponderance of the evidence showed that the deceased, long prior to the accident in question, was suffering from syphilis; that same was an arrested case, but that Webster's death resulted from syphilitic condition and not from the injury complained of.

The jury found that Webster's death resulted from an injury negligently inflicted on him by a switchman of appellant in letting down an apron on his head, thus causing an injury from which Webster died. The evidence on the issue is too extensive to reproduce here. We have carefully studied the testimony, and have concluded that the jury's findings are sufficiently supported by the evidence. We have stated the undisputed facts as to the letting down of the apron on Webster's head while he was in the act of climbing to the top of the car.

The evidence of physicians who testified on the trial show that an autopsy was performed on the body of Webster which included an examination of the "thoracic and abdominal viscera, and the brain, removing the brain, and a part of the spinal cord, making gross and microscopic examination and tests thereof." Witnesses testified they found no evidence whatever of syphilis in Webster's brain; that a detailed study of Webster's brain was made; that the heart and the aorta were in condition in which they would not have been if Webster had had syphilis.

The accident to Webster occurred in September, 1930; Webster laid off from work as switchman about February 16, 1931. Dr. Herbert Stevenson testified that he treated Webster prior to March 2, 1931, for a brain condition which witness considered the result of an injury on the head. Witness testified that he assisted in making an autopsy of Webster's brain about April 30, 1931, and found no thrombosis of the blood vessels feeding the brain or any portion of it. It was stated to witness, Dr. Stevenson, that on February 18, 1931, and subsequent thereto, Wasserman tests were made of Webster's blood, and of his spinal fluid, and each test showed negative; witness was asked whether or not, if Webster had sufficient syphilitic acitivity in hs blood stream to produce a thrombosis, that is, the obstruction of a blood vessel by a clot of blood, it would have shown positive in those Wasserman tests, to which the witness answered it would.

The evidence shows that the Wasserman test is the most accurate test known to the medical science for the determination of the presence of syphilis.

Other evidence in the record, in connection with the above, is sufficient, we think, to sustain the jury's findings.

After a careful review of the evidence, we have concluded that reversible error is not made to appear, and the case is affirmed.